597 P.2d 290

**UNITED NUCLEAR CORPORATION, Plaintiff-Appellee,**

v.

**GENERAL ATOMIC COMPANY, a partnership composed of Gulf Oil Corporation and Scallop Nuclear, Inc., Defendant-Appellant,**

**Indiana and Michigan Electric Company, Defendant-Appellee.**

**No. 11775.**

Supreme Court of New Mexico.

May 7, 1979.

Rodey, Dickason, Sloan, Akin & Robb, John D. Robb, Richard C. Minzner, Albuquerque, Montgomery, Andrews & Hannahs, Seth D. Montgomery, Santa Fe, Howrey & Simon, Washington, D. C., for General Atomic Co.

Bigbee, Stephenson, Carpenter & Crout, Harry L. Bigbee, Donnan Stephenson, G. Stanley Crout, Michael R. Comeau, Larry Maldegan, Mel E. Yost, Santa Fe, for appellee United Nuclear Corp.

James T. Paulantis, Albuquerque, Simpson, Thacher & Bartlett, Rogers M. Doering, New York City, for appellee Indiana & Michigan Elec. Co.

## OPINION

EASLEY, Justice.

Appellee-plaintiff, United Nuclear Corporation (UNC), filed this declaratory judg-

ment action in the Santa Fe County District Court against appellant-defendant, General Atomic Company (GAC), alleging fraud, unlawful monopolistic practices and violation of the antitrust laws, and seeking cancellation of two uranium supply contracts and damages. GAC denied those allegations, claimed the principal issues are subject to arbitration under the terms of the contract, and counterclaimed against UNC for over one billion dollars in damages.

Indiana and Michigan Electric Company (I & M) and Detroit Edison Company (Detroit), (collectively "the utilities"), were brought into the suit as third-party defendants because they were to be supplied uranium products by GAC from the supplies that UNC had contracted to deliver.

The district court enjoined GAC from proceeding to litigate or arbitrate the same issues in any other jurisdiction. GAC appealed to the U.S. Supreme Court, and that Court reversed.

The trial had been in progress almost sixty days when the U.S. Supreme Court mandate came down, but GAC moved to stay the trial until arbitration of the issues could be accomplished. The trial judge denied the motion on the grounds that GAC had waived its right to arbitration. GAC appeals this partial final judgment. We affirm.

The principal issues are:

(1) Whether the Federal Arbitration Act applies.

(2) Whether the issue of waiver of arbitration is for the court or for the arbitrators.

(3) If the determination is to be made by the court, whether the evidence here supports the trial court's finding of waiver.

(4) Whether under the circumstances GAC was constitutionally entitled to further hearing before the district court on the issue of waiver.

Other claims advanced by GAC are that: (5) the trial court's actions were inconsistent with the decision of the U.S. Supreme Court in this case; (6) the holding that the state's antitrust claims are not arbitrable was in error; (7) the trial court should have stayed or severed the Duke and Commonwealth demands; and, (8) UNC obtained incorrect findings on issues not addressed below.

### Factual Background

As we survey the massive accumulation of evidence, which could be measured by the ton, the key inquiry is: What was the intent of GAC? Did it intend to arbitrate, litigate or both? In order to determine this intent, we consider all the material assertions and objective manifestations of GAC, together with all other facts and circumstances. This calls for greater detail in setting forth the facts.

UNC and GAC were parties to two contracts, one dated June 30, 1973 (1973 Supply Agreement) covering approximately twenty-five million pounds of uranium, and one dated June 28, 1974 covering three million pounds of uranium (1974 Concentrates Agreement), under which UNC was to supply uranium to GAC. The 1973 Supply Agreement contained an arbitration clause calling for arbitration of all disputes under the rules of the American Arbitration Association (AAA). These rules provide a simple method of invoking arbitration. The initiating party makes demand, setting forth the nature of the dispute, the amount involved and the remedy sought. This is served on the other party and filed in any regional office of AAA, accompanied by a proper fee. (When GAC ultimately filed its motion for stay, it consisted of two pages, and the demand for arbitration contained three and one-half pages.)

GAC is a partnership composed of Gulf Oil Corporation and Scallop Nuclear, Inc. On August 8, 1975 UNC first filed suit in the Santa Fe District Court against GAC as well as the individual partners in GAC, Gulf and Scallop, asking for a declaratory judgment and damages and raising all issues arising under the 1973 Supply Agreement. The cause was removed by the defendants to the U.S. District Court for the District of New Mexico. Gulf and Scallop moved to

extend the time to answer the complaint and to object to interrogatories propounded by UNC. As grounds for the motion, movants alleged that more time was necessary to determine whether to seek arbitration.

On October 6, 1975 Gulf filed a motion for additional time, stating that failure to demand arbitration prior to answering the complaint without asserting its right to arbitration might constitute a waiver of Gulf's right to compel arbitration. UNC sought voluntary dismissal of the cause in federal court, *which the defendants opposed*; but, the case was dismissed on December 31, 1975, five months after being filed. Neither GAC, Gulf nor Scallop had demanded arbitration or requested a stay in the proceedings to arbitrate.

On December 31, 1975, the same day the first suit was dismissed, UNC again filed suit, against GAC only, in the District Court of Santa Fe County alleging virtually identical claims and filing identical interrogatories. GAC then filed an affidavit of disqualification against Judge Santiago Campos.

On January 19, 1976 GAC filed a federal interpleader action in the U.S. District Court for the District of New Mexico against UNC, I & M, and Detroit as well as Duke Power Company and Commonwealth Edison Company. Although stating that it was not waiving its right to arbitration, GAC sought the judicial determination of all the rights and obligations of the parties under the 1973 Supply Agreement and other utility agreements. On March 2, 1976 the case was dismissed for lack of subject matter jurisdiction. GAC appealed the dismissal to the Tenth Circuit where it was affirmed in April of 1977. *General Atomic Co. v. Duke Power Co.*, 553 F.2d 53 (10th Cir. 1977).

In February and March 1976 GAC filed motions to dismiss for lack of personal jurisdiction, for additional time to answer interrogatories, and for dismissal due to the failure to join certain parties. All three motions specified that they were made "without waiving its right to demand arbitration."

In a brief in support of its application to dismiss for lack of jurisdiction, filed on March 22, 1976, the following statement was contained: "At the outset, defendant admits to having filed various legal actions in New Mexico because New Mexico provided the only or best forum for the vindication of its rights in various matters."

In March 1976 UNC moved for a default judgment for a willful failure to answer interrogatories, but later withdrew the application "in consideration of the agreement attached hereto." The agreement specified that GAC was to answer "in good faith all interrogatories to defendant presently pending." The parties stipulated to a number of actions to be taken in the discovery process which would not have been available as a matter of right under arbitration, and which ultimately cost the parties millions of dollars. Nothing was mentioned in the stipulation regarding GAC's asserted right to arbitrate.

On March 15, 1976 UNC applied for an injunction to restrain GAC from *filing suit* against UNC in other jurisdictions concerning the same facts and circumstances. No mention was made of arbitration. On that same date a temporary restraining order was issued for a ten-day period prior to the hearing enjoining GAC from filing suits or third-party complaints against UNC in any other jurisdiction. The restraining order placed no restraints on GAC against demanding arbitration and seeking a stay of the court proceedings during this period of time, which was seven months after the first complaint had been filed. Up to that time, GAC had made no demand for arbitration upon which a challenge to the jurisdiction of the court could be predicated. GAC filed a response and memorandum brief in answer to the motion for a preliminary injunction but did not mention the issue of arbitration therein.

The first indication in the record of proceedings that arbitration might be enjoined is a statement by the court at the hearing held on April 2, 1976 on the application for enjoining lawsuits in other forums. The judge referred to a letter written by him,

dated March 29, 1976, three days before the hearing, in which he had outlined the terms of the proposed preliminary injunction. One of the terms was to restrain GAC from seeking *arbitration* in any other forum, a remedy not even requested by UNC. The letter was received by GAC attorneys on March 30, 1976. No effort was indicated on the part of GAC to preclude a hearing on restraints against arbitration because of lack of proper notice, and no effort to demand arbitration before the hearing. The preliminary injunction followed closely the statement of terms contained in the letter.

As bearing on GAC's avowed allegiance to arbitration of the issues here, there was a significant colloquy among the attorneys and the judge at the hearing on the motion for preliminary injunction held three days after GAC received the judge's letter. The letter and the form of the preliminary injunction were under discussion. GAC made reference to the clause in the contract providing for arbitration and called specific attention to the New Mexico Uniform Arbitration Act, § 44–7–2(D), N.M.S.A.1978, which reads as follows:

> Any action or proceeding involving an issue subject to arbitration shall be stayed if an order for arbitration or an application therefor has been made under this section . . . .

During those proceedings nothing was mentioned by GAC regarding federal arbitration rights.

GAC's attorney stated further: "We want to make sure and we have admitted language to this effect, that we are not foreclosed, because obviously the Plaintiff would not be foreclosed from demanding arbitration *in this action.*" (Emphasis added.) GAC further complained that it was unequal treatment to enjoin GAC from participation in arbitration in other actions and not to restrain UNC from doing so. GAC asked that it not be deprived of the right to demand arbitration and suggested that it would be inappropriate to foreclose such remedy.

UNC stipulated that it should be equally enjoined by the preliminary injunction and the court interlined wording in the order to effect this purpose. The following discussion then took place:

MR. THOMPSON: . . . [W]e believe that we should not be foreclosed, in spite of what the Plaintiff has stated at this point. I have also raised the question of the *possibility* of the Defendants desiring to exercise their rights to arbitration *in this case,* under Article 17 of the Contract, . . . (Emphasis added.)

THE COURT: Subject to the supervision of this court.

MR. THOMPSON: *That is correct.* We would ask that the Injunction be clear in excluding any prohibition against us demanding arbitration *in this case.* (Emphasis added.)

MR. BIGBEE: It is clear enough anyway, anything they want to file into this action will be subject to your Honor's decision.

THE COURT: Did you, Mr. Bigbee, in your application for a Preliminary Injunction contemplate that the Defendants be enjoined from arbitrating under the Arbitration Clause of the Contract in this forum subject to the jurisdiction of this Court?

MR. BIGBEE: I did not. I understood that it may or may not come up. I have asked repeatedly if they want arbitration, they have never answered me; I think they waived it. That is not the point that I wanted an Injunction on. Anything they want to submit under their responsive pleadings, under the rules, they are entitled to do it.

The court, at another point when the language of the preliminary injunction was being discussed, stated:

THE COURT: I don't think there is anything in the language here that relates to arbitration in this forum pursuant to the arbitration clause contained in the contract. If there is any question about it that can be clarified.

MR. BIGBEE: There is no question that they have the right to include that, whether it should be granted or what[,]

it is, [sic] under Your Honor's jurisdiction. . . .

The preliminary injunction, as issued, restrained GAC from either arbitrating or litigating the same issues "in any other forum." The dispute was brought to this Court, where the trial court was sustained, and then was taken to the United States Supreme Court, which held that the trial court could not properly restrain GAC from seeking relief in federal courts or by arbitration under the Federal Arbitration Act, 9 U.S.C. §§ 1–14.

GAC filed its answer on May 5, 1976 stating that the answer was "as to all matters in which arbitration is not being sought by defendant and as to all issues which the court may deem unarbitrable." GAC did not raise the issue of arbitration as an affirmative defense, nor did it ask for a stay in the proceedings for the purpose of demanding arbitration or arbitrating the dispute. GAC also counterclaimed, asking the court to enforce the contractual obligations or, in the alternative, for damages in the sum of $1,030,000,000 and costs.

The parties prepared a voluminous pretrial order which was signed by the court and filed in August 1977 in which there was nothing mentioned at any point about arbitration rights, although GAC prepared its portion of the order. I & M and Detroit were involuntarily joined as defendants at the instance of GAC on some issues different from those asserted against UNC.

The first demand for arbitration came on November 30, 1977 and made its way into the record at page 5455 of the transcript of the record proper at a point where it took over 2,000 additional pages of transcript of proceedings to detail the progress of the suit.

Thereafter, for a total period of over two years, dating from the filing of the first complaint up to the demand for arbitration, the parties were in and out of the district court, the federal courts, and this Court dozens of times on motions and interlocutory appeals. Most of the activity in the district court concerned discovery proceedings for which the parties obviously expended millions of dollars. GAC claimed to have submitted 6,000,000 pages of material for UNC to inspect and claimed that UNC had actually copied approximately 180,000 pages. GAC alleged that producing the documents and answering interrogatories propounded by UNC had involved on its part the efforts of more than 37 lawyers, 19 para-professionals, 80 management personnel and engineers, plus secretarial and clerical personnel. The total hours allegedly consumed by April 19, 1977 was estimated to be 34,700. Over 100 depositions were taken resulting in 16,000 pages of testimony and 2,785 deposition exhibits. GAC contended that the parties had designated approximately 11,000 exhibits. UNC claimed that GAC had copied 500,000 pages of its records.

1. *Applicability of The Federal Arbitration Act*

■ Although there was considerable controversy at trial over whether the state or federal statutes govern the arbitration rights of the parties, the trial court concluded that it had jurisdiction under the Federal Arbitration Act, 9 U.S.C. §§ 1–14. The parties now agree with this judgment, as do we.

■ GAC insisted below that the federal act applies while UNC was contending that the New Mexico Uniform Arbitration Act governs. Sections 44–7–1 to 22, N.M.S.A. 1978. The trial court first held with UNC, but in the decision being appealed, concluded that jurisdiction was present under both acts. GAC complains that the record does not show that the court decided the issue based on the federal act, although concluding that it applied. We cannot go behind a valid conclusion to invalidate it by showing that the judge reached it for the wrong reasons. *Tsosie v. Foundation Reserve Insurance Company*, 77 N.M. 671, 427 P.2d 29 (1967); *Holmes v. Faycus*, 85 N.M. 740, 516 P.2d 1123 (Ct.App.1973).

The federal act provides, in § 3, that when a proceeding is brought in court involving any issue referrable to arbitration,

the court "shall on application of one of the parties stay the trial of the action until such arbitration has been had . . . providing the applicant for the stay is not in default in proceeding with such arbitration." The statute does not specifically mandate that a demand for arbitration must be made before application is made to the court for a stay. UNC claims that GAC is in "default" under the terms of this statute and has therefore waived its right to seek arbitration.

#### 2. Forum for Question of Waiver

GAC insists that the arbitration board and not the court should decide whether GAC has waived its rights to arbitration. Although GAC relies on authority to the contrary,[1] at least a strong majority of courts take jurisdiction over the issue with many finding that waiver has occurred. *Demsey & Associates v. S. S. Sea Star*, 461 F.2d 1009 (2d Cir. 1972); *Burton-Dixie Corp. v. Timothy McCarthy Const. Co.*, 436 F.2d 405 (5th Cir. 1971); *Cornell & Company v. Barber & Ross Company*, 123 U.S.App. D.C. 378, 360 F.2d 512 (1966); *American Locomotive Co. v. Gyro Process Co.*, 185 F.2d 316 (6th Cir. 1950).[2]

The Federal Arbitration Act, 9 U.S.C. § 3, clearly mandates that a court in which a case is pending, and a stay is requested for arbitration, has jurisdiction to determine whether the movant is "in default in proceeding with such arbitration."

Our case was in this precise posture. We hold that the judge was not in error in assuming jurisdiction to decide the question of waiver.

#### 3. Question of Waiver

Although there is disagreement from case to case as to what set of facts will justify a holding that a party has waived his rights to arbitration, the federal courts have developed general principles that are useful in appraising this issue. It has been held that the Federal Arbitration Act evidences a strong federal policy favoring the enforcement of arbitration agreements. *Hanes, supra; Demsey, supra; Carcich v. Rederi A/B Nordie*, 389 F.2d 692 (2d Cir. 1968). The reasons for the encouragement of arbitration are to ease the congestion in the court systems, to speed up the resolution of disputes, and to afford a more economical means of disposing of cases. *Griffin v. Semperit of America Inc.*, 414 F.Supp. 1384 (S.D.Tex.1976). *See also Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974); *Commonwealth Edison Co. v. Gulf Oil Corp.*, 541 F.2d 1263 (7th Cir. 1976).

As is true in other types of contracts, a party may waive certain terms, but in arbitration agreements the courts hold that all doubts as to whether there is a waiver must be resolved in favor of arbitration. *Robert Lawrence Company v. Devonshire Fabrics, Inc.*, 271 F.2d 402 (2d Cir. 1959), *cert. grant-*

1. *Hanes Corp. v. Millard*, 174 U.S.App.D.C. 253, 531 F.2d 585 (1976); *World Brilliance Corp. v. Bethlehem Steel Co.*, 342 F.2d 362 (2d Cir. 1965); *Lundell v. Massey-Ferguson Services N. V.*, 277 F.Supp. 940 (N.D.Iowa 1967); *Auxiliary Power Corporation v. Eckhardt & Co.*, 266 F.Supp. 1020 (S.D.N.Y.1966); *Lowry & Co. v. S. S. Le Moyne D'Iberville*, 253 F.Supp. 396 (S.D.N.Y.1966), *appeal dismissed*, 372 F.2d 123 (2d Cir. 1967).

2. Other courts that have decided the issue of waiver and found that rights have been lost are: Circuit Courts: *E. C. Ernst, Inc. v. Manhattan Const. Co. of Tex.*, 559 F.2d 268 (5th Cir. 1977; on rehearing); *Gutor International AG v. Raymond Packer Co., Inc.*, 493 F.2d 938 (1st Cir. 1974); *E. I. Du Pont De Nemours & Co. v. Lyles & Lang Const. Co.*, 219 F.2d 328 (4th Cir. 1955), *cert. denied*, 349 U.S. 956, 75 S.Ct. 882,

99 L.Ed. 1280 (1955); *American Locomotive Co. v. Chemical Research Corp.*, 171 F.2d 115 (6th Cir. 1948), *cert. denied*, 336 U.S. 909, 69 S.Ct. 515, 93 L.Ed. 1074 (1949); *Galion Iron Works & Mfg. Co. v. J. D. Adams Mfg. Co.*, 128 F.2d 411 (7th Cir. 1942). District Courts: *Weight Watch. of Quebec Ltd. v. Weight W. Int., Inc.*, 398 F.Supp. 1057 (E.D.N.Y.1975); *Liggett & Myers Incorporated v. Bloomfield*, 380 F.Supp. 1044 (S.D.N.Y.1974); *Sulphur Export Corporation v. Carribean Clipper Lines, Inc.*, 277 F.Supp. 632 (E.D.La.1968); *United Nations Children's Fund v. S/S Nordstern*, 251 F.Supp. 833 (S.D.N.Y.1966). *See also N&D Fashions, Inc. v. DHJ Industries Inc.*, 548 F.2d 722 (8th Cir. 1977); *Gulf Central Pipeline Co. v. Motor Vessel Lake Placid*, 315 F.Supp. 974 (E.D.La.1970).

*ed,* 362 U.S. 909, 80 S.Ct. 682, 4 L.Ed.2d 618 (1960), *cert. dismissed per stipulation,* 364 U.S. 801, 81 S.Ct. 27, 5 L.Ed.2d 37 (1960); *Bigge Crane and Rigging Co. v. Docutel Corporation,* 371 F.Supp. 240 (E.D.N.Y. 1973).

■ The party asserting the default in pursuing arbitration bears a heavy burden of proving waiver. *General Guar. Ins. Co. v. New Orleans General Agency, Inc.,* 427 F.2d 924 (5th Cir. 1970); *Hilti, Inc. v. Oldach,* 392 F.2d 368 (1st Cir. 1968).

■ The courts generally hold that dilatory conduct by the party seeking arbitration, unaccompanied by prejudice to the opposing party, does not constitute waiver. *Demsey, supra; Carcich, supra.* Waiver cannot be inferred merely from a party's attempt to meet all issues raised between it and another party. *Germany v. River Terminal Railway Company,* 477 F.2d 546 (6th Cir. 1973); *Romnes v. Bache & Co., Inc.,* 439 F.Supp. 833 (W.D.Wis.1977). " '[D]efault' under the [Federal Arbitration Act] may not rest mechanically on some act such as the filing of a complaint or answer but must find a basis in prejudice to the objecting party." *Batson Y. & F. M. GR., Inc. v. Saurer-Allma GmbH–Allgauer M.,* 311 F.Supp. 68, 73 (S.C.1970).

■■ It must appear that the delay in requesting arbitration was an intentional relinquishment of the right to arbitrate. Such intention may be inferred when a party takes action inconsistent with its right to demand arbitration. *Weight Watchers, supra. See Cornell, supra; The Belize,* 25 F.Supp. 663 (S.D.N.Y.1938). It is the objective manifestation of intent upon which the opposing party may rely. The question should be determined by the trier of facts based on the evidence in each case. *Burton-Dixie, supra; Weight Watchers, supra.* An appellate court should accept such factual determination if supported by substantial evidence. *Burton-Dixie, supra; Galion Iron Works, supra.*

In *Cornell, supra,* the trial court denied a stay under 9 U.S.C. § 3, because the party was "in default in proceeding with such arbitration," and stated:

A party waives his right to arbitrate when he actively participates in a lawsuit or takes other action inconsistent with that right. Once having waived the right to arbitrate, the party is necessarily "in default in proceeding with such arbitration."

Before filing the present motion, appellant (1) moved for a transfer of venue to the Eastern District of Pennsylvania, (2) filed an answer to appellee's complaint and a counterclaim, and (3) filed notice of depositions, took the deposition of an official of appellee, and procured the production of various records and documents. As the District Court stated:

> [T]he litigation machinery had been substantially invoked and the parties were well into the preparation of a lawsuit by the time (some four months after the complaint was filed) an intention to arbitrate was communicated by the defendant to the plaintiff.

360 F.2d at 513. (Footnotes omitted.)

In *Weight Watchers, supra,* the court made a determination as to the elements of waiver in these cases, stating:

> The factors upon which the waiver question appears to have turned most frequently against the party seeking to compel arbitration are his dilatory conduct in seeking arbitration, usually coupled with his gaining of an undue advantage in the judicial forum or other substantial prejudice to the opposing party, or any other actions taken by the moving party which are sufficiently inconsistent with his seeking arbitration. Examining the circumstances of a particular case, it is usually the absence of one or more of these factors that forms the basis for concluding there has been no waiver.

398 F.Supp. at 1059. (Footnotes omitted.)

As a basis for holding that waiver had been correctly determined, the court in *Burton-Dixie, supra,* stated the evidence to be as follows:

> [A]t no time before answering the complaint in the instant lawsuit did McCarthy demand that the matter be submitted

to the architect or to arbitration. Even when Burton-Dixie filed suit against McCarthy, McCarthy did not attempt to invoke the arbitration provision in the contract. In its answer to the complaint, McCarthy did not ask the court to stay proceedings pending arbitration, but rather denied liability and set up as an affirmative defense Burton-Dixie's failure to arbitrate. Moreover, McCarthy impleaded as third-party defendants two of its subcontractors and proceeded to litigate the dispute over the defective roof.

436 F.2d at 408–409. The court concluded that McCarthy waived its right to insist upon arbitration.

The United States Court of Appeals in *Demsey, supra,* after analyzing numerous cases which hold that there was no waiver under the particular facts, stated:

> We have found no cases, however, where arbitration has been allowed after a party has answered on the merits, asserted a cross-claim that was answered, participated in discovery, failed to move for a stay, and gone to trial on the merits.
>
> . . . . .
>
> We can think of no clearer case of prejudice than we have here in this case. The substantial expense to all concerned that was involved in the trial of all the factual and legal issues in the case, including those raised by Jordan's cross-claims, was caused by Jordan's full participation in the pretrial procedures and in the trial on the merits, despite its mere allegation of the arbitration clause in the voyage charter as a defense. We think it would be a gross miscarriage of justice now to require a retrial by arbitration of any of these issues.

461 F.2d at 1018.

In *Gavlik Const. Co. v. H. F. Campbell Co.,* 526 F.2d 777, 783 (3d Cir. 1975), the court stated: "Recent cases have only found waiver where the demand for arbitration came long after the suit commenced and when both parties had engaged in extensive discovery." (Citing *Demsey, supra; American Locomotive v. Gyro, supra;*

*Ernst, supra; Liggett, supra* ; and *Sulphur Export, supra.*)

Failing to invoke arbitration for ten months from the date the suit was commenced, while at the same time obtaining many benefits from pre-trial discovery that would not have been available had they reasonably demanded arbitration, was held to constitute waiver of the arbitration provision in *Liggett, supra.* The parties demanding arbitration had answered and counterclaimed without asserting their right to arbitration, but they had actively participated in the discovery process and obtained a number of extensions. The court held that their acts and conduct had been prejudicial and thus constituted waiver.

In *E. C. Ernst, supra,* the court found waiver, stating:

> When one party reveals a disinclination to resort to arbitration on any phase of suit involving all parties, those parties are prejudiced by being forced to bear the expenses of a trial, which in this case was quite lengthy. Arbitration is designed to avoid this very expense. Substantially invoking the litigation machinery qualifies as the kind of prejudice to Manhattan that is the essence of waiver. (Citations omitted.)

559 F.2d at 269.

A party to a lawsuit who claims the right to arbitration must take some action to enforce that right. *Burton-Dixie, supra.* This must be done within a reasonable time after suit is filed. *Demsey, supra; American Locomotive v. Gyro, supra.*

The courts have held a variety of acts to be inconsistent with a party's alleged reliance on arbitrating the dispute in question. The determination of waiver seldom turns on a single inconsistent act or failure to act. Some of the conduct or acts of a party in relationship to a claim subject to arbitration that have been considered by themselves, or in conjunction with others, to constitute default or waiver are as follows: Answering a complaint, *Demsey, supra; Cornell, supra; Weight Watchers, supra;*

*Liggett, supra* ; counterclaiming in a judicial proceeding, *Demsey, supra; Cornell, supra; American Locomotive v. Gyro, supra; Liggett, supra* ; filing a complaint, *Gutor International supra; Bank of Madison v. Graber*, 158 F.2d 137 (7th Cir. 1946); *Galion Iron Works, supra* ; participating in a discovery process in a lawsuit, *Demsey, supra; Cornell, supra; Liggett, supra* ; moving for summary judgment, *Weight Watchers, supra* ; going to trial on the merits, *Demsey, supra; Blake Construction Company v. United States*, 252 F.2d 658 (5th Cir. 1958); *Radiator Specialty Co. v. Cannon Mills*, 97 F.2d 318 (4th Cir. 1938).

Preparation for trial by a party based on the belief that the other party does not desire or intend to make a demand for arbitration has been held to constitute substantial prejudice which may invoke a waiver or constitute a default under the Federal Arbitration Act. *Demsey, supra; Weight Watchers, supra.*

■ The courts also consider any advantage that may have been received by a party that might not otherwise have been available to the party under an arbitration proceeding by reason of participating in the discovery process. *Liggett, supra.* Neither the federal statutes nor the rules of AAA give a party an absolute right to demand discovery. As a general rule, discovery is very limited in arbitration proceedings. Once a district court has stayed judicial proceedings pending arbitration, the parties may not continue discovery in the district court. *Mississippi Power Company v. Peabody Coal Company*, 69 F.R.D. 558 (S.D. Miss.1976); *Commercial Solvents Corp. v. Louisiana Liquid F. Co.*, 20 F.R.D. 359 (S.D. N.Y.1957); *Cavanaugh v. McDonnell & Company*, 357 Mass. 452, 258 N.E.2d 561 (1970). In *Bigge, supra*, a federal district court did enforce discovery which had been ordered by the arbitrator, but did so on a showing of necessity rather than of mere convenience. Later cases have denied discovery, but, based on *Bigge, supra*, have indicated that discovery might be proper in extraordinary circumstances. *Coastal States Trading, Inc. v. Zenith Nav. S. A.*, 446 F.Supp. 330 (S.D.N.Y.1977); *Levin v. Ripple Twist Mills, Inc.*, 416 F.Supp. 876 (E.D.Pa.1976).

■ Discovery procedures are often the most expensive and time-consuming elements of a court trial, and thus have often been considered to be inconsistent with the reasons for arbitration. *Commercial Solvents, supra.* In most cases, discovery in arbitration is limited to the discovery available under the Arbitration Act itself. M. Domke, The Law and Practice of Commercial Arbitration, § 27.01 (1968); G. Goldberg, A Lawyer's Guide to Commercial Arbitration, § 3.03 (1977). The only discovery mentioned in the Act is the taking of depositions of witnesses who cannot be subpoenaed or who are unable to attend the hearing.

No one act or a specific series of acts has been held consistently to indicate waiver. The courts have looked to the totality of the proof in each case to arrive at a decision. We take into consideration all of the material facts to determine whether GAC defaulted on its obligation to make a timely demand for arbitration and a stay of proceedings and thus waived its rights.

We ask whether GAC intended to arbitrate or litigate. However, it would be a mistake to assume that each of these courses is mutually exclusive of the other. We must inquire whether it can be inferred from the circumstances that the intent of GAC was to litigate *and* arbitrate. The purpose could plausibly be to preserve the right to arbitrate and at the same time litigate down to the last possible moment. Thus, we examine not only the acts of GAC that occurred prior to the time the injunction was entered on April 2, 1976 but the conduct or inaction of GAC thereafter as bearing on the real designs of the company.

■ It is hornbook law that intent is a state of mind. As such, it generally remains hidden within the brain where it was conceived. It is rarely, if ever, susceptible of proof by direct evidence. It must be inferred from the words, acts or conduct of the party entertaining it as well as the

other attendant facts and circumstances. No citations as to these principles are necessary.

In applying the above law to the facts in this case we consider the challenges specified by GAC. As to waiver, GAC challenged six of the district court's findings of fact that: (a) the preliminary injunction did not prohibit GAC from demanding arbitration in the district court; (b) for twenty-seven months GAC did not "in any way manifest its intention or desire to arbitrate rather than litigate"; (c) GAC made numerous motions for extensions and discovery orders and "represented to the district court that such orders were necessary for its preparation for trial"; (d) information obtained from UNC by GAC by way of discovery would not otherwise have been available to it; (e) UNC had been prejudiced and would be irreparably injured if a stay were ordered; and (f) GAC was in default and had relinquished any rights to arbitrate.

(a) The extent to which GAC was *prohibited,* if at all, by the injunction from making demand for arbitration and from requesting a stay of the proceedings in the district court is a very crucial matter with GAC. That company contends that the injunction absolutely prohibited it from demanding arbitration outside New Mexico and that arbitration within New Mexico was ordered to be conducted only under the supervision of the district court. GAC argues that this was such a violation of its rights that it had no duty to pursue the matter further in the trial court. GAC claims that its actions after the issuance of the injunction were strictly in self-defense and were forced upon it by the illegally obtained injunction.

It is further claimed by GAC that its actions prior to the issuance of the injunction on April 2, 1976 were not such as would justify a finding of waiver and that most of the conduct of GAC upon which UNC relies for support of its allegation of waiver occurred after GAC was unlawfully restrained from seeking arbitration.

We look at all the evidence. The hearing on April 2, 1976 on the motion for an injunction is most significant. The motion did not contain any plea for restraining arbitration; and the temporary restraining order mentioned only restraints on suing or counterclaiming. The first time that the record shows notice to GAC that the court was even considering enjoining arbitration demands was in the judge's letter of March 30, three days before the hearing. However, GAC did not object to holding the hearing insofar as it pertained to arbitration, did not demand arbitration in the interim, did not seek to continue the hearing while it took the proper steps to demand arbitration and to request a stay in the suit, and did not raise the issue of its rights under the Federal Arbitration Act at the hearing on the motion.

The reliance of GAC on § 44–7–2 of the New Mexico Uniform Arbitration Act, which provides for an automatic stay of court proceedings pending arbitration on "application therefor", indicates that GAC was fully aware of this simple means of putting an immediate halt to the litigation, yet its lawyers talked only of the "possibility of arbitration". Bearing in mind that the colloquy among lawyers and judge may not ordinarily be considered to dispute the judgment, it is still admissible as being indicative of the intent of GAC, with regard to arbitration as opposed to litigation upon which UNC and the court were entitled to rely. GAC only alerted the court to its right to demand arbitration under the New Mexico Uniform Arbitration Act, where it would be entitled to an automatic stay in the event that it demanded arbitration, and made references only to arbitration "in this case". Thus, another well-known risk was taken by GAC, i. e., that it would not later be permitted to complain because of failing to properly object. N.M.R.Civ.P. 46, N.M.S.A.1978; N.M.R.Civ.App. 11, N.M.S.A.1978.

Although the court offered clarification of what was meant by a right to arbitrate "in this forum", none was ever requested at that time or any later time, nor was any effort made to determine what the judge meant when he said that if GAC decided to

exercise its rights to arbitration it would be done "subject to the supervision of this court." The latter expression could be interpreted in many ways, one of which could be that the judge believed that he had the power to refuse to stay the proceedings if the evidence showed a default on GAC's part in demanding arbitration that amounted to a waiver. Another probability is that the court would want to retain jurisdiction over any contested items in the contract that were not subject to arbitration. Furthermore, the court would have the jurisdiction to inquire whether or not there was in fact a valid contract providing for arbitration. No clarification was sought and none was thereafter offered.

There is nothing in the preliminary injunction that prohibited GAC from demanding arbitration at any time by serving a demand on UNC in New Mexico, without regard for the location at which the arbitration would take place. This would have set the stage for a claim by GAC that the court did not have jurisdiction. The argument that GAC could do nothing with regard to arbitration is not persuasive. Nor is the claim that it had to await the decision of the U. S. Supreme Court before it could make any demands for arbitration. The U. S. Supreme Court decision did not change the portion of the preliminary injunction giving GAC the right to demand arbitration in New Mexico.

Common sense dictates that a litigant that has been so capably represented by such a host of outstanding lawyers, who have meticulously handled every other infinitesimal detail, and who have verbally displayed such ferocious passion for arbitration, could have found a way to say: "Judge, we want to arbitrate." There were no restraints on filing a motion in the trial court for leave to arbitrate. Admittedly, it is not called for under the federal law, but the failure of GAC to adopt such a simple and plausible course of action is a commentary on the validity of its claimed intent to arbitrate.

██ Inherent in GAC's argument is the impermissible presumption that if it had made demand for arbitration the trial court would have acted unlawfully rather than follow the mandate of the Federal Arbitration Act. We must presume that the court would have done its "supervision" in accordance with that law. The law presumes that rulings of district courts have validity. *Coastal Plans Oil Company v. Douglas*, 69 N.M. 68, 364 P.2d 131 (1961); *Carlile v. Continental Oil Company*, 81 N.M. 484, 468 P.2d 885 (Ct.App.1970). *A fortiori*, the law must presume that rulings which district courts may be called upon to make in the future will likewise be valid.

██ As suggested by GAC, the court's finding that the preliminary injunction did not prohibit GAC from demanding arbitration with UNC *"in this forum"* shows a tinge of legal conclusion. The thrust of GAC's challenge to this finding is more in the nature of a complaint that it was wrong for the court to prohibit arbitration *in other forums*. The U. S. Supreme Court agreed with this theory; however, the finding, or the mixed finding and conclusion, is obviously correct because the prohibition did not run against demanding arbitration with UNC in New Mexico. In order to assert any right to arbitration under 9 U.S.C. § 3, it was mandatory that GAC make a demand for arbitration and make application to the Santa Fe County District Court for a stay in these proceedings, at which time the trial court would have been obligated under federal law to determine whether GAC was in default in demanding arbitration. This is exactly what occurred after the U. S. Supreme Court mandate came down.

██ Early in its appeal, GAC, in discussing the scope of review available to this Court, argued that we should not apply the substantial evidence rule. The argument is, since the trial judge reached his findings by the use of documentary evidence, the pleadings and the statements of the attorneys, this Court is in as good a position to determine the facts by preponderance of the evidence as was the trial judge. We think this case is not a good subject for the application of that principle. We hold that *Valdez v. Salazar*, 45 N.M. 1, 107 P.2d 862

(1940) is more in point where this Court stated:

> Where all or substantially all of the evidence on a material issue is documentary or by deposition, the Supreme Court will examine and weigh it, and will review the record, giving some weight to the findings of the trial judge on such issue, and *will not disturb the same upon conflicting evidence unless such findings are manifestly wrong or clearly opposed to the evidence.* (Emphasis added.)

*Id.* at 7, 107 P.2d at 865.

■ We affirm the trial court's ruling that the preliminary injunction did not prohibit GAC from demanding arbitration in that court.

(b) GAC filed numerous pleadings which stated that it did not intend to waive its rights to arbitration. However, the trial court found that for a period of twenty-seven months GAC did not "in any way manifest its *intention or desire* to arbitrate rather than litigate the issues between the parties arising under the 1973 Supply Agreement." (Emphasis added.) GAC's intentions are the number one question in this case. GAC claims that its numerous statements that it did not intend to *waive its right* to demand arbitration was sufficient to establish its intent. UNC urges that an intention to *preserve the right to demand arbitration* is not the same as an intention or desire *to arbitrate.* UNC relies on the other acts and conduct of GAC to prove that a good faith intent to arbitrate was not shown.

The record shows that GAC was fully aware of the perils of dilatory conduct in asserting its arbitration rights. This knowledge surfaced in its first pleading. However, it took obvious risk after obvious risk. It did not assert arbitration as an affirmative defense in its answer, thus taking the chance of having the issue excluded under N.M.R.Civ.P. 8(c) and 12(b), N.M.S.A. 1978, which call for every defense in law or fact to be "asserted." "The failure to plead the arbitration clause as a defense to the lawsuit will be considered a waiver of the party's rights arising under such clause."

M. Domke, *supra.* § 19.01, page 181 (1968); *Almacenes Fernandez, S. A. v. Golodetz*, 148 F.2d 625 (2d Cir. 1945). Generally the courts have held that failure to plead an affirmative defense results in the waiver of that defense; and it is excluded as an issue. *Radio Corporation of America v. Radio Station KYFM, Inc.,* 424 F.2d 14 (10th Cir. 1970).

■ GAC further imperiled its position by failing to assert arbitration as a defense in the pre-trial order. Parties are expected to disclose at a pre-trial hearing all legal and factual issues which they intend to raise in the lawsuit. N.M.R.Civ.P. 16, N.M. S.A., 1978; *Becker v. Hidalgo*, 89 N.M. 627, 556 P.2d 35 (1976); *Harvey v. Eimco Corp.,* 33 F.R.D. 360, (E.D.Pa.1963); *Burton v. Weyerhaeuser Timber Co.,* 1 F.R.D. 571 (D.Or.1941). The parties are limited to the issues contained in the order and must not introduce issues not so contained at trial. *Fowler v. Crown-Zellerbach Corporation,* 163 F.2d 773 (9th Cir. 1947).

Although these two lapses by GAC and others cited are not conclusive of voluntary waiver, they do add to the volume of proof that the court and UNC were misled into believing that GAC intended to litigate the issues and that its intent to arbitrate was not as strong as it now contends.

■ An attempt to reserve a right inconsistent with that asserted is ineffectual. *The Belize, supra; Commercial Bank v. Central Nat. Bank,* 203 S.W. 662 (Mo.App. 1918).

■ There was no error in the trial court's finding that GAC did not manifest an intention and desire to arbitrate, as opposed to litigating. The finding is based upon substantial evidence. We will not disturb such a finding. *Montoya v. Travelers Ins. Co.,* 91 N.M. 667, 579 P.2d 793 (1978).

■ (c) The court's finding that GAC made repeated representations to the district court that it needed extensions of time and in "all" instances said the purpose was to enable it to "prepare for trial", is challenged on grounds that most of the acts

occurred after the issuance of the preliminary injunction and that *every* such action was not accompanied by the alleged representation. However, GAC failed to comply with N.M.R.Civ.App. 9(d), N.M.S.A.1978, which requires that the substance of all the evidence be stated with proper transcript references. The same is true of GAC's challenges to the court's findings that UNC had provided *all* materials to GAC sought on discovery and that GAC obtained "huge amounts of information from UNC which would not otherwise be available to it." We hold that challenges (c) and (d) fell short of complying with Rule 9(d) and will not be considered. *Perez v. Gallegos*, 87 N.M. 161, 530 P.2d 1155 (1974); *Galvan v. Miller*, 79 N.M. 540, 445 P.2d 961 (1968). However, as to the merits of the two challenges, careful scrutiny of the record discloses insubstantial support for the contentions. Even if error had been committed as to one or both issues, it would not be dispositive of the case.

(e) The court's finding that UNC had been prejudiced by GAC's default in demanding arbitration is attacked on the basis that there was no such prejudice shown by the events prior to the entry of the injunction against arbitration and that, after the entry of that injunction, GAC's conduct could not be considered in determining waiver. This issue is partially resolved by our holding that there is substantial evidence that GAC did not properly manifest its intention or desire to arbitrate during a period of twenty-seven months from the time of the filing of the first lawsuit to a point well into the trial of the second case.

By that time, UNC had spent millions of dollars on discovery proceedings and trial preparation. UNC takes the position that GAC obtained the advantages of discovery that would not have been available to GAC as a matter of right under the Federal Arbitration Act.

■■■ GAC argues that the court's findings of prejudice should be categorized as a legal conclusion and that it was not incumbent upon GAC to establish the lack of an evidentiary basis for the finding as required by Rule 9(d). Even though it is for the court to conclude whether there is prejudice, it is clear that a conclusion must be based on findings of fact that have support in the record. The conclusion fails when it is demonstrated that it has no proper support in the facts. Even though the substantiality of the evidence on this point may not be properly before us, we nevertheless hold on the merits that the evidence in the record substantiates a finding that GAC's default in demanding arbitration caused material prejudice to UNC both before and after the preliminary injunction was issued.

■■■ (f) The last finding challenged is that GAC was in default and had relinquished any right to arbitrate. This finding overlaps many of the others. This holding must be predicated upon finding substantial evidence from the entire record.

This complex, multi-party, multi-issue litigation was within days of final solution at the trial level when the first *demand* was made for arbitration. This very simple act of stating, in writing: "We want to arbitrate", followed by a motion for a stay of litigation, would have challenged the jurisdiction of the court to proceed. Our search of the record reveals no instance where these words were either written or spoken until November of 1977.

Without reiterating the facts relied upon, we hold that there is substantial evidence to support the court's finding that GAC was in default and thus waived its right to arbitration.

The parties expressly provided that the AAA Rules would govern arbitration under the 1973 Uranium Supply Agreement. GAC claims that waiver is entirely precluded under § 46(a) of these rules which specifies:

> No judicial proceedings by a party relating to the subject matter of the arbitration shall be deemed a waiver of the party's right to arbitrate.

GAC relies upon *People ex rel. Delisi Const. Co., Inc. v. Board of Ed.*, 26 Ill. App.3d 893, 326 N.E.2d 55 (1975). This case

is distinguishable in that it involved a delay by the party seeking arbitration only for a period during which the validity of the contract to arbitrate was being decided, as opposed to trial preparation and trial in our case. Furthermore, the Illinois Court recognized that only arbitrable questions are covered by § 46(a) by stating:

> Moreover, the arbitration clause provides that *arbitrable questions* be decided "in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association . . . (Emphasis added.)

326 N.E.2d at 57–58.

■■■■■ UNC cites M. Domke, *supra*, at 264, to support its contention that Rule 46(a) is designed only to provide that, after arbitration has been commenced, there is no waiver by participation in judicial proceedings *supplementary to* and *in aid of arbitration*. UNC argues that, regardless of the AAA Rule, a party may be in default in demanding arbitration, as specifically mentioned in the Federal Arbitration Act, and therefore, have no arbitrable questions remaining which could be governed by § 46(a). In the latter situation, it is the province of the court to determine whether there has been a default. The parties are precluded from contracting to exclude the court from jurisdiction over this issue. *American Sugar Refining Co. v. The Anaconda*, 138 F.2d 765 (5th Cir. 1943), aff'd, 322 U.S. 42, 64 S.Ct. 863, 88 L.Ed. 1117 (1944); *Ocean Science & Eng., Inc. v. International Geomarine Corp.*, 312 F.Supp. 825 (Del.1970).

### 4. *Procedural Issues*

GAC argues that the procedures followed by the court below in arriving at a decision were defective in that (a) the court below failed to exercise its independent judicial discretion in entering its findings and conclusions; and (b) the court erred in disposing of GAC's arbitration claim without a trial-type evidentiary hearing.

(a) GAC states that the findings of fact and conclusions of law were adopted entirely from the proposed findings and conclusions submitted by UNC. GAC argues that this procedure was in violation of N.M.R. Civ.P. 52(B)(a)(5) and (7), N.M.S.A.1978, and also in violation of the leading case law.

In reviewing the cases cited by GAC it appears that the practice of adopting findings and conclusions entirely as submitted by one of the parties has been held to be error in only the most extreme circumstances. *See Mora v. Martinez*, 80 N.M. 88, 451 P.2d 992 (1969); *Chicopee Manufacturing Corp. v. Kendall Company*, 288 F.2d 719 (4th Cir. 1961), *cert. denied*, 368 U.S. 825, 82 S.Ct. 44, 7 L.Ed.2d 29 (1961). Most of the cases hold that, although the practice is not to be commended, it is not reversible error so long as the findings adopted are supported by the record. *United States v. El Paso Gas Co.*, 376 U.S. 651, 84 S.Ct. 1044, 12 L.Ed.2d 12 (1964); *U. S. v. Crescent Amusement Co.*, 323 U.S. 173, 65 S.Ct. 254, 89 L.Ed. 160 (1944); *Bradley v. Maryland Casualty Company*, 382 F.2d 415 (8th Cir. 1967). The prodigious record in this case provides ample support for the court's findings.

■■■■■ The court entered an order expressly refusing all requested findings and conclusions inconsistent with those announced in its decision. GAC urges that there was a failure to strictly comply with Rule 52(B)(a)(5) since the judge did not mark GAC's requested findings and conclusions "refused". We find no prejudice and thus no reversible error. *Martinez v. Research Park, Inc.*, 75 N.M. 672, 410 P.2d 200 (1966), *rev'd on other grounds*, 86 N.M. 151, 520 P.2d 1096 (1974).

■■■■■ As to Rule 52(B)(a)(7), GAC argues that the court adopted the findings and conclusions offered by UNC and, by separate order, refused GAC's "inconsistent" findings and conclusions. The gist of this argument is that this violates the single document requirement of the rule. However, the word "decision" as used in Rule 52 means "'findings of fact and conclusions of law.'" *Trujillo v. Tanuz*, 85 N.M. 35, 38, 508 P.2d 1332, 1335 (Ct.App.1973). Rule 52 contains no requirement that an order *refusing* proposed findings be included in the same document as the court's decision.

(b) GAC's motion for a stay requested a hearing. The trial court gave the parties short notice to submit affidavits and briefs on the facts and the law, but did not hear oral argument or testimony. GAC did not object at the trial level to the sufficiency of the hearing, did not complain that it was being deprived of due process, and did not tender any additional evidence in support of the motion. This issue is raised for the first time on appeal. GAC now argues that it was entitled to a trial-type hearing, claiming that the Federal Arbitration Act and the constitutional due process clauses require such a hearing. The question, however, is what type of hearing is "appropriate to the nature of the case." *Mullane v. Central Hanover Tr. Co.*, 339 U.S. 306, 313, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950). We must look to the Federal Arbitration Act and the cases interpreting it.

Section 3 of the Federal Arbitration Act provides for a stay of pending court action on application of one of the parties when the trial court is satisfied that the issue involved is referable to arbitration and that the applicant for the stay of court proceedings is not in default in proceeding with such arbitration. Section 4 of the Act, on the other hand, contemplates a situation where no court action is pending. It allows for a party to petition any *United States District Court* for an order to compel arbitration, and provides for jury trial. *Prima Paint v. Flood & Conklin*, 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967) held that, under either section, a federal court may consider only issues relating to the making and performance of the agreement to arbitrate. In that case, the Court said nothing regarding the procedures to be followed in deciding those limited issues.

Section 6 of the Federal Arbitration Act states: "Any application to the court hereunder shall be made and heard in the manner provided by law for the making and hearing of motions, except as otherwise herein expressly provided." Section 4 is the only exception to § 6. *World Brilliance, supra.*

Section 4 provides: "A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court . . . for an order directing that such arbitration proceed . . . ." By its literal language, § 4 is applicable only to United States District Courts. *See Robert Lawrence*, 271 F.2d at 407. We have found no authority which indicates that a party may petition a state court for an order to compel arbitration under § 4 of the Federal Arbitration Act. We therefore conclude that § 4 is not applicable to this case.

Except for claims brought pursuant to § 4 of the federal act, claims under that act are to be heard as motions rather than by trial. *World Brilliance, supra.* "Motions may be decided wholly on the papers, and usually are, rather than after oral examination and cross-examination of witnesses." *Id.* 342 F.2d at 366. Contrary to the arguments of GAC, *Prima Paint, supra*, does not change the import of the decision in *World Brilliance.*

GAC claims that the failure to accord it a hearing was a violation of its due process rights. The requirements of due process are not technical, and no particular form of procedure is necessary for protecting substantial rights. *Mitchell v. W. T. Grant Co.*, 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974). The circumstances of the case dictate the requirements. *Rivera-Lopez v. Gonzalez-Chapel*, 430 F.Supp. 704 (D.Puerto Rico 1975). The integrity of the fact-finding process and the basic fairness of the decision are the principal considerations. *Boykins v. Fairfield Board of Education*, 492 F.2d 697 (5th Cir. 1974), *cert. denied*, 420 U.S. 962, 95 S.Ct. 1350, 43 L.E2d 438 (1975). Oral argument on a motion is not a due process right. *Spark v. Catholic University of America*, 167 U.S.App.D.C. 56, 510 F.2d 1277 (1975); *Skolnick v. Spolar*, 317 F.2d 857 (7th Cir. 1963), *cert. denied*, 375 U.S. 904, 84 S.Ct. 195, 11 L.Ed.2d 145 (1963).

In our case, the trial judge was ending the second month of the trial on the merits,

and had virtually lived with the participants in this controversy for over two years at the time the ruling complained of was made. The record was approaching the 10,-000 page point, and exhibits were running into the hundreds of thousands of pages and were being measured by the running foot.

The parties had full opportunity to brief the facts and the law, and they filed extensive briefs with the court before this decision. Both sides filed requested findings of fact and conclusions of law.

 Although UNC claims that GAC waived its right to a hearing by failing to properly object and alert the court to the right, if it had such right, we do not decide the issue of waiver. We hold instead that the hearing held by the court was "appropriate to the nature of the case". *Mullane, supra; World Brilliance, supra;* 9 U.S.C. § 6.

5. *Inconsistency of Proceedings*

 GAC claims that the actions of the trial court were inconsistent with the holdings of the U.S. Supreme Court in *General Atomic Co. v. Felter,* 434 U.S. 12, 98 S.Ct. 76, 54 L.Ed.2d 199 (1977). This bears on the district court's determination not to stay the trial on the grounds that GAC had waived its right to arbitrate and that the New Mexico antitrust claims were not arbitrable as a matter of law.

In *General Atomic,* the Supreme Court ruled that, "it is not within the power of state courts to bar litigants from filing and prosecuting *in personam* actions in the federal courts." 434 U.S. at 12, 98 S.Ct. at 76. The district court then modified its April 2, 1976, injunction to exclude from its terms and conditions all *in personam* actions in federal courts "and all other matters mandated to be excluded from the operation of said preliminary injunction by the Opinion of the United States Supreme Court, dated October 31, 1977."

The district court had jurisdiction over the arbitration controversy under the Federal Arbitration Act, at least up to approxi-

mately sixty days into the trial of the case on the merits, when GAC made demand for arbitration and moved for a stay in the proceedings. When GAC sought a stay the trial court had the obligation to determine whether the issues involved in the suit were referable to arbitration under the agreements, and whether "the applicant for the stay is not in default in proceeding with such arbitration. . . ." 9 U.S.C. § 3. The trial judge made these determinations in favor of UNC. There is nothing in the Supreme Court's decision that prohibits this type of disposition since it comports with the federal statutes.

 There was nothing in the amended injunction which prohibited GAC from demanding arbitration in the case to be conducted in any location, so long as an application was made to the district court to stay the pending trial. The Federal Arbitration Act prevented GAC from proceeding with arbitration without an order from Judge Felter. 9 U.S.C. § 3.

Furthermore, in *General Atomic Co. v. Felter,* 436 U.S. 493, 496–97, 98 S.Ct. 1939, 58 L.Ed.2d 480 (1978), decided after argument in this case, the Court observed: "Clearly, our prior opinion did not preclude the court from making findings concerning whether GAC had waived any right to arbitrate * * *. Nor did our prior decision prevent the Santa Fe court * * * from declining to stay its own trial * * *."

6. *Arbitration of State Antitrust Laws*

The trial court held that claims raised under the New Mexico Antitrust Act, 57–1–1 to 6, N.M.S.A.1978, were not arbitrable and that other claims in the suit were so intertwined with the anti-trust claims, that none were arbitrable. Although we consider that our decision that GAC has waived its arbitration rights is controlling, in the interest of judicial economy, we decide the antitrust questions.

Even though the Federal Arbitration Act contemplates that *all* claims are arbitrable where there is a contract to arbitrate, the federal courts have established an exception where the federal antitrust laws are con-

cerned. In reconciling two strong and conflicting federal policies, the federal courts have established the rule that claims under the Federal Antitrust Act are not arbitrable under the Federal Arbitration Act. *Applied Digital Tech., Inc. v. Continental Cas. Co.,* 576 F.2d 116 (7th Cir. 1978); *Cobb v. Lewis,* 488 F.2d 41 (5th Cir. 1974); *Power Replacements, Inc. v. Air Preheater Co.,* 426 F.2d 980 (9th Cir. 1970); *American Safety Equipment Corp. v. J. P. Maguire & Co.,* 391 F.2d 821 (2d Cir. 1968). The New York courts have held that claims arising under that state's antitrust act were not arbitrable under the New York Arbitration Act. *Schachter v. Lester Witte & Co.,* 52 A.D.2d 121, 383 N.Y.S.2d 316 (1976), *aff'd on other grounds,* 396 N.Y.S.2d 175, 364 N.E.2d 840 (1977); *Aimcee Wholesale Corp. v. Tomar Products, Inc.,* 21 N.Y.2d 621, 289 N.Y.S.2d 968, 237 N.E.2d 223 (1968). We found no case on the issue of whether state antitrust claims are arbitrable under the Federal Arbitration Act. The parties cited none.

GAC argues that, by virtue of the supremacy clause of the United States Constitution, state antitrust claims cannot be applied to bar arbitration under the Federal Arbitration Act. We do not agree.

The policies underlying both federal and state antitrust laws are concurrent, as indicated by the legislative history of the federal act. During the debates on the federal legislation, Senator Sherman commented:

> Each State can and does prevent and control combinations within the limit of the State. This we do not propose to interfere with. The power of the State courts has been repeatedly exercised to set aside such combinations . . . .

21 Cong.Rev. 2456 (1890).

Senator Sherman further stated that the act was designed to "arm the Federal courts . . . that they may co-operate with the State courts in checking, curbing, and controlling the most dangerous combinations that now threaten the business, property, and trade of the people of the United States . . . ." and that the Act was "in this way to supplement the enforcement of the established rules of common

and statute law by the courts of the several States." 21 Cong.Rec. 2457 (1890).

Twenty-one states had constitutional or statutory antitrust laws when the Sherman Antitrust Act was passed on July 2, 1890. 26 Stat. 209. 15 U.S.C. § 1 *et seq.* Very shortly thereafter in 1891, the Territorial Legislature of New Mexico passed an antitrust act in which the pertinent and material language is almost identical with the federal law. Chapter 10, § 1 *et seq.,* page 28, *Acts of the Legislative Assembly of the Territory of New Mexico,* 1891. The New Mexico Constitution in Article IV, § 38, later provided that the Legislature "shall enact laws to prevent trusts, monopolies and combinations in restraint of trade."

To further emphasize the common purpose underlying antitrust enforcement and the cooperation between federal and state authorities, we note that as late as the 95th Congress $11 million in federal grants were made available to aid the states in improving antitrust enforcement. Pub.L. 95–86. *See* S.Rep.No.95–285 to accompany H.R. 7556, 95th Cong., 1st Sess. 18 (1977).

■ The underlying purposes behind both the federal and state Laws are the same, to establish a "public policy of first magnitude"; that is, promoting the national interest in a competitive economy. *American Safety Equipment, supra.* We perceive no "clash of competing fundamental policies" between the two statutes as GAC claims. We are convinced by the basic policy considerations expressed in the federal and New York cases holding that antitrust issues are not arbitrable. *American Safety Equipment, supra; Aimcee, supra.* The cases have developed a body of law that is supportive of an integrated federal-state policy mandating that our courts not abdicate their control over antitrust policy. *Aimcee, supra.*

The rationale for this principle is well-stated in *American Safety Equipment, supra.* The court reasoned that a claim under the antitrust laws is not merely a private matter. The Sherman Act is designed to promote the national interest in a competi-

tive economy. The plaintiff is likened to a private attorney-general who protects the public's interest. Violations can affect hundreds of thousands—perhaps millions—and inflict staggering economic damage. "We do not believe that Congress intended such claims to be resolved elsewhere than in the courts." 391 F.2d at 827. The court thought it proper to ask whether contracts of adhesion between alleged monopolists and their customers should determine the forum for trying antitrust violations. "Since commercial arbitrators are frequently men drawn for their business expertise, it hardly seems proper for them to determine these issues of great public interest." *Id.* at 827. It would surely not be a way of assuring the customer that objective and sympathetic consideration would be given to his claim. The court stated:

> We conclude only that the pervasive public interest in enforcement of the antitrust laws, and the nature of the claims that arise in such cases, combine to make the outcome here clear.

*Id.* at 827–28.

The validity of these reasons does not vanish simply by exchanging the federal judge for one in a state court who is charged with the same responsibility to enforce a strong public policy against monopolistic practices.

"It is now cardinal doctrine that the public interest in the enforcement of antitrust laws makes antitrust claims inappropriate subjects for arbitration." *Hunt v. Mobil Oil Corporation,* 410 F.Supp. 10, 25 (S.D.N.Y. 1976), *cert. denied,* 434 U.S. 984, 98 S.Ct. 608, 54 L.Ed.2d 477 (1977). This strong language leaves no room for argument that, if you swap a large judge for a small one, public interest disappears.

The New York Court of Appeals in *Aimcee, supra,* held that the enforcement of the state's antitrust policy was of such extreme importance to all of its people that commercial arbitration was not a fit instrument for the determination of these controversies. The court reasoned that arbitrators are not bound by rules of law, and their decisions are essentially final. The awards may not be set aside for misapplication of the law. Records need not be kept upon which a review of the merits may be had. Arbitrators are not obliged to give reasons for their rulings or awards. The courts may be called upon to enforce arbitration awards which are directly at variance with the statutory law and the public policy as determined by the decisions of the court. *See generally Applied Digital, supra; Cobb, supra; Power Replacements, supra; American Safety Equipment, supra; Aimcee, supra;* and *Annot.,* 3 A.L.R.Fed. 918, § 2 (1970).

GAC cites several cases which hold that, in enacting the Federal Arbitration Act, Congress created federal substantive law which controls over inconsistent state substantive law. *E. g. Grand Bahama Petroleum Co. v. Asiatic Petroleum,* 550 F.2d 1320 (2d Cir. 1977); *Commonwealth Edison Co. v. Gulf Oil Corp.,* 541 F.2d 1263 (7th Cir. 1976); *Stokes v. Merrill Lynch, Pierce, Fenner & Smith,* 523 F.2d 433 (6th Cir. 1975); *Lawn v. Franklin,* 328 F.Supp. 791 (S.D.N.Y.1971). In each of the cases cited by GAC, however, the Federal Arbitration Act was held to control over various *conflicting* state laws, other than state antitrust statutes.

■ We hold that the enforcement of state antitrust law by the courts rather than by arbitrators is entirely consistent with congressional intent because (1) the state and federal antitrust acts serve to protect the same societal interests, and (2) the Federal Arbitration Act itself provides that arbitration agreements in contracts involving commerce are enforceable "save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.

■ Title 9 U.S.C. § 2 has been construed by several courts. *Litton RCS, Inc. v. Pennsylvania Turnpike Commission,* 376 F.Supp. 579 (E.D.Pa.1974), *aff'd by order,* 511 F.2d 1394 (3d Cir. 1975), turned on whether a state agency had authority to enter into the particular contract. The District Court held that before a state may limit conditions under which a public instru-

mentality, otherwise possessing the power to arbitrate, may contract to arbitrate, it must do so in a clear and express manner. The court found that the provisions of the Pennsylvania Arbitration Act did constitute an express limitation on the authority of the Turnpike Commission to contract in a manner contrary to such act. The court then held that the Federal Arbitration Act provided for the incorporation of state law governing enforceability of contracts. It is only when a state law contravenes express provisions of the federal act that the state law must fail. If state law prohibits a public instrumentality from agreeing to arbitrate in a certain manner, the defense that the agency acted ultra vires, in agreeing to arbitrate in that manner, was available to the agency under the Federal Arbitration Act *"if such a defense would constitute 'grounds as exist at law or in equity for the revocation of any contract.'"* (Emphasis added; citation omitted). *Id.* at 587.

In *American Airlines, Inc. v. Louisville & Jefferson C. A. B.,* 269 F.2d 811 (6th Cir. 1959), the court reviewed the congressional intent behind the Federal Arbitration Act and stated with reference to arbitration agreements:

[T]here appears no indication whatever of congressional intent that such agreements would be made valid, irrevocable and enforceable solely by virtue of the Federal arbitration statute.

\* \* \* \* \* \*

[T]he Federal Arbitration Statute was intended to declare no more than that agreements to arbitrate "involving commerce" . . . are by virtue of the Federal arbitration statute valid and enforceable, *unless by other Federal law or by State law such agreements are for other reasons to be held invalid or revocable or unenforceable.* (Emphasis added.) *Id.* at 816.

■ The Federal Arbitration Act clearly does not require enforcement of arbitration agreements contained in contracts which are themselves void by operation of a state law which applies to contracts generally. *See Collins Radio Company v. Ex-*

*Cell-O Corporation,* 467 F.2d 995 (8th Cir. 1972). Section 57–1–3, N.M.S.A.1978, provides:

All contracts and agreements in violation of the foregoing two sections [which prohibit monopolies and restraints of trade] shall be *void* . . . . .

Since the federal and state antitrust laws protect the same interests of society, we do not perceive that Congress intended, by enacting the Federal Arbitration Act, to require arbitration under the terms of a contract which is challenged as being in violation of the state antitrust laws. Because of the policy reasons mentioned above, we deem that issues raised under the state antitrust act are not arbitrable.

GAC argues that several issues are unrelated to the antitrust claim and are severable. They argue that the court erred in not allowing arbitration of these other issues.

Whether all issues in the case were so intertwined with antitrust issues as to prohibit arbitration was a question which was answered in the affirmative in *Hunt, supra.* Citing *American Safety Equipment, supra,* and *Cobb, supra,* the court in *Hunt* stated the question to be:

[W]hether the antitrust issues so permeate the entire case that it would not be "easy for an arbitrator to separate the antitrust issues from the other issues in the case, and to proceed to decide the arbitrable issues without inquiry into the antitrust issues."

410 F.Supp. at 26.

■ The standard of review is whether the trial court abused its discretion. *Applied Digital, supra; A. & E. Plastik Pak Co., Inc. v. Monsanto Co.,* 396 F.2d 710 (9th Cir. 1968). A review of the record in this case clearly indicates that the issues are "complicated, and the evidence extensive and diverse . . . ." *American Safety Equipment,* 391 F.2d at 827. It would not be "easy for an arbitrator to separate the antitrust issues from the other issues in the case, and to proceed to decide the arbitrable issues without inquiry into the antitrust issues." *Cobb,* 488 F.2d at 50.

The lower court did not abuse its discretion in holding that all the issues in this case are so intertwined with the antitrust issues that no issues are arbitrable.

### 7. Arbitration with Duke and Commonwealth

GAC contends that UNC has a duty to arbitrate jointly with GAC and Duke Power Company as well as Commonwealth Edison Company, two utility firms that were relying on GAC to supply them with uranium obtained from UNC under the 1973 Uranium Supply Agreement. Duke and Commonwealth had separate contracts under which GAC was obligated. However, GAC claimed that UNC's duty was to supply the uranium "in accordance with the terms and conditions" of the utility contracts. GAC urges that the arbitration clauses in the separate Duke and Commonwealth contracts are incorporated into the 1973 Uranium Supply Agreement by reference because of the above quoted language.

UNC argues that Duke and Commonwealth are not parties to this suit, that the rights and obligations as to those two companies as related to UNC cannot be litigated, and that there is nothing in any of the contracts which obligates UNC to arbitrate with GAC with regard to its duties to those two companies.

The trial court found that the Duke and Commonwealth contracts contained no arbitration agreements between GAC and UNC, and concluded that the agreements with the two utilities did not give GAC any right to demand arbitration with UNC. Since this issue deals solely with GAC's rights to arbitrate with UNC under the terms of the 1973 Uranium Supply Agreement, it is not necessary that we address this issue. GAC has waived whatever arbitration rights it had under the 1973 Uranium Supply Agreement.

### 8. Alleged Findings on Issues Not Addressed Below

■ GAC complains that the court's finding that *every* extension of time sought by GAC was accompanied by a representation that the extension was needed to prepare for trial is not correct because there is no evidence that *every* action was so accompanied. Error is also alleged in the finding by the trial court that UNC had furnished to GAC *all* of the materials to which it was entitled, GAC contending that the evidence indicates that UNC had made inadequate discovery. GAC further complains that there is no evidence in the record to support the finding that the information obtained by GAC in discovery would not otherwise be available to it. It is not shown that there is prejudice to GAC, even if the challenges have merit. We hold that the challenges to these three findings do not constitute material issues that affect the disposition of this case. *Alonso v. Hills*, 95 Cal. App.2d 778, 214 P.2d 50 (1950); *Costello v. Bowen*, 80 Cal.App.2d 621, 182 P.2d 615 (1947).

■ It was never intended that the Federal Arbitration Act be used as a means of furthering and extending delays. The policy is to eliminate the delay and expense of extended court proceedings. *Trafalgar Shipping Co. v. International Milling Co.*, 401 F.2d 568 (2d Cir. 1968), *Gulf Central Pipeline Co. v. Motor Vessel Lake Placid*, 315 F.Supp. 974 (E.D.La.1970).

This court holds that the critical elements of inconsistent action, unwarranted delay and substantial prejudice are too prevalent in this case to avoid a holding of waiver. Thus, we affirm the decision of the trial court.

IT IS SO ORDERED.

SOSA, C. J., and PAYNE, J., concur.