643 P.2d 1234

Joseph A. DiIACONI and Haskel Wright,
Plaintiffs-Appellants,

v.

NEW CAL CORPORATION, A New Mexi-
co corporation, and Don R. Miehls,
Christel Miehls and Dennis Miehls, as
directors of said corporation and indi-
vidually, Defendants-Appellees.

No. 5319.

Court of Appeals of New Mexico.

April 1, 1982.

Richard W. Darnell, Neal & Neal, Hobbs, Rosenberg Law Firm, Carlsbad, for plaintiffs-appellants.

B. G. Davis, Paine, Blenden & Diamond, Carlsbad, for defendants-appellees.

## OPINION

WALTERS, Chief Judge.

The trial court dismissed the plaintiffs-minority shareholders' derivative action and request for liquidation, brought pursuant to § 53–16–16, N.M.S.A.1978. They appeal; we affirm.

Plaintiffs DiIaconi and Wright are minority shareholders (11% each) in defendant New Cal Corporation (New Cal), a New Mexico corporation formed in the late 1960's for the purpose of developing a 340-acre tract of land located west of Carlsbad, New Mexico. The individual defendants, Don, Christel and Dennis Miehls, are and were during the material transactions complained of, officers and directors of New Cal. Don is the majority shareholder (56%) and president of New Cal; Christel is his wife and New Cal's secretary-treasurer; and Dennis, their son, is vice-president of the corporation.

In 1975, Don Miehls (Miehls) began development work of Fountain Hills subdivision, a portion of the tract of land belonging to New Cal. Plaintiffs were opposed to this development. During 1976 through 1978, Miehls personally undertook to lay approximately 6000 feet of utility lines, 4000 feet of water lines, and several thousand feet of cablevision, telephone, and electrical lines in the subdivision. Miehls secured financing for the project, directed the development, did a portion of the trenching himself, promoted the sale of lots, sold all but one of the lots himself, and arranged with the City for paving the subdivision's streets. During 1976 he completed construction of a home for himself on one lot in the subdivision, and in 1977 he built another home for a Mr. Truitt. Subsequently, five more residences were built in the subdivision.

The minority stockholders' 1979 suit alleged Miehls's conversion of corporate assets. They requested an accounting, restoration of corporate assets, injunctive relief, removal of corporate officers, appointment of a receiver and, in another count, liquidation of the corporation.

After a hearing on August 30, 1979, the trial court ordered defendants to "construct a proper set of books of account and records for the corporation from December, 1973 to the present date with appropriate authenticating data, documentation and index to all transactions," and restrained the directors from incurring further expenses or disposing of corporate assets. Mr. Sides, an ac-

countant hired by Miehls, prepared the records. They were available to plaintiffs by November 30, 1979.

On August 29, 1980, defendants moved to dissolve the trial court's restraining order. Following a trial on the merits, the trial judge dissolved the restraining order and dismissed the suit. Arguing on appeal that the trial court erred in (1) not rendering a decision regarding the derivative action; (2) overextending the business judgment rule; and (3) refusing to grant their application for liquidation, plaintiffs contend that the following findings of fact are not supported by substantial evidence:

4. At time of trial, extensive accounting work had been done, and the books and records of the corporation were brought current, and made available for inspection by the parties.

5. The major problem with the business relation of the parties is, and has been, the fact that the plaintiffs are minority stockholders in a closely held corporation; the majority stockholder has used his controlling interest in the conduct of the business of the corporation, has made decisions as to the incurring of indebtedness, has planned the development of the land, has made sales, and has made business decisions with respect to the manner in which the affairs of the corporation are to be managed. The majority of the business decisions made by the corporation are questioned by and objected to by the minority stockholders. It is the view of the Court that the problem is inherent in the business relationships of the parties and their respective interests in the corporation, and is not a problem capable of resolution by the Court.

6. The business decisions and the management of the affairs of the corporation by the defendant, by use of his majority stock interest, are within the bounds of discretion, and sufficiently in the interests of the corporation that they should not be disturbed by the Court.

Plaintiffs point to seven instances of allegedly improper self-dealing between Miehls and the corporation that they claim should result in his return of funds and a ditching machine to the corporation. It is their position that Miehls's conduct constituted breach of his fidiciary duties to the stockholders which entitled plaintiffs to liquidation pursuant to § 53–16–16, N.M.S.A. 1978. Three of the seven transactions were authorized at a board of directors meeting; the other four were business decisions made by Miehls acting as the manager and majority stockholder of the corporation. Our review of plaintiffs' contentions has not been materially assisted by the brief of defendants, who respond principally with the argument that the trial decision is supported by substantial evidence. We have examined the three-volume transcript in this case, and discuss the issues raised in the light of the evidence presented.

## I.

On September 1, 1977, a special meeting of the board of directors of New Cal was held, at which time the board approved the following matters:

1. Approval of $40,000 as a fee to Miehls in compensation for his efforts commencing in 1975 in developing the subdivision.

2. Sale of Lot # 1, Unit 1, to Don Miehls for $10,000, an amount less than fair market value, upon the consensus that the home built on this lot would "obtain necessary advertising" for the subdivision.

3. Absorption by the corporation of any loss on the construction of the Truitt home because it would be "a benefit to the corporation to continue to have construction on the subdivision in order to further said development."

We summarize plaintiffs' challenges to those decisions.

### 1. The Management Fee

Plaintiffs contend that the $40,000 management fee authorized by the board was

excessive and illegal. The trial court heard evidence that Miehls spent 14–16 hours a day developing the subdivision. One exhibit showed that he devoted 100% of his time to that effort. The accountant testified to the reasonableness of the fee and said he had suggested the figure, based upon his familiarity with corporate fees for similar management work by corporate officers.

Regarding plaintiffs' argument that any "agreement to pay a management fee which amounts to a distribution of corporate assets without regard to surplus or net profit" is a violation of §§ 53–11–45 and 53–11–46, N.M.S.A.1978 (1981 Cum. Supp.), it is not convincing. There is no evidence that payment was made from capital surplus, to which the statutes refer. *See* definition of "capital surplus" in *Comm'r of Corp. & Taxation v. Filoon*, 310 Mass. 374, 38 N.E.2d 693, 699 (1941). "Capital surplus" is defined in ABA Model Business Corporation Act § 2(m) as "the entire surplus of a corporation other than its earned surplus." There is no evidence that payment of the fee is properly described as a statutorily impermissible "distribution of corporate assets," as plaintiffs argue. In the context of the statutes to which plaintiffs refer, it is clear that forbidden distributions to "shareholders out of capital surplus of a corporation [of] a portion of its assets, in cash or profits," mean those distributions to shareholders of corporate property paid to the corporation by the shareholders in excess of the capital stock liability, which would render the corporation insolvent, would deprive preferential shareholders of accrued dividends to which they were entitled, or would reduce the corporation's assets below the amount preferential shareholders could claim in the event of involuntary liquidation. *Filoon, supra*; see Comment to §§ 2, 46, ABA Model Business Corporation Act., Vol. I, pp. 34–36, 938–939. The management fee was not a "distribution" of capital surplus.

## 2. The Price of the Lot to Miehls.

Plaintiffs assert that Miehls had a lot deeded to himself, valued at $16,800, for which he paid nothing. Miehls set the original price on the lots in the subdivision and priced all of them at $16,800. None of the lots sold for the amount at which they were originally priced; in fact, at least three lots next to Miehls sold for $12,700. The directors set the price on Miehls' lot at $10,000, allowing a reduced price in exchange for the value of advertising they deemed inherent in construction at the subdivision site. Ten thousand dollars of the $40,000 fee authorized by the directors to be paid to Miehls was allocated to pay for the lot upon which he built his home. The assertion that Miehls paid nothing for the lots is contrary to the evidence; the court obviously agreed that the sale of Miehls was not detrimental to the corporation (Finding 6).

## 3. The Truitt Transaction.

In plaintiffs' view, Miehls constructed the Truitt home in his individual capacity, through his individual proprietorship known as Miehls Enterprises, and then persuaded a board composed of family members to approve the corporation's absorption of any loss incurred in its construction. The contracts for buying the lot and building the Truitt home were executed by Don Miehls and Miehls Enterprises. Neither Miehls nor New Cal had a contractor's license at the time. Miehls considered that he was building the home on behalf of the corporation. The testimony of Miehls and the minutes of the directors meeting reflect that the board absorbed the loss because it felt that the corporation would benefit from construction activity at the site and that Miehls himself, as the majority stockholder, would bear 56% of any loss incurred. The trial court accepted the explanation for the board's decision as "within the bounds of discretion and sufficiently in the interests of the corporation." (Finding 6.)

## II.

The four transactions approved by Miehls in his capacity as manager and controlling stockholder of the corporation, and questioned by plaintiffs, are discussed in order:

1. *The Ditching Machine.*

Plaintiffs urge that the Ditch Witch (a machine used for excavating in rock) is a corporation asset and that the charge of $22,005 to the corporation for trenching performed by Miehls should be voided. The record indicates that in October of 1975 Miehls bought a ditching machine on credit, and signed the purchase contract in his own name. Miehls testified that he paid $8,215.15 on the total purchase price of $20,-432.64 from Fountain Lounge funds, one of his personally owned businesses, and from some of the money he borrowed for interim financing of the corporation's subdivision development. At the same time, he was paying other corporate development costs from Fountain Lounge and his own personal funds. There is no doubt that there was commingling of personal and corporate moneys. Mr. Sides, the accountant, separated the funds and transactions as completely as possible in order to construct books and to make tax returns. That reconstruction reflected debits and credits to Miehls' account, including the Ditch Witch payments, which resulted in an amount payable to Miehls of $10,926.93 after reconciliation of all of the commingled transactions. It is reasonable to conclude that the court was satisfied that even if Miehls had borrowed corporate financing moneys for payments on the Ditch Witch, it was repaid by him when his account was reconciled. There is no evidence to refute that all of the financing for the corporation was obtained only through Miehls's personal signature on the interim and permanent loans. The trial court was unwilling to find that Miehls' borrowing of some of the money that he alone had arranged for or had advanced himself, to purchase the machine in his name, and which was repaid, was proof of a breach of fiduciary duty. We will not disturb reasonable inferences drawn from disputed facts. *Webb v. Arizona Pub. Serv. Co.,* 95 N.M. 603, 624 P.2d 545 (Ct.App. 1981).

A separate argument on this item is plaintiffs' objection to Miehls's billing to the corporation of $22,005 for trenching performed at the subdivision. Miehls testified that he made no profit on that work. He charged the corporation by the foot, and he personally paid for new parts, gasoline, maintenance, repairs, and a machine operator. The trier of facts resolves questions of fact. *Webb, supra.*

On another ground, plaintiffs' objection to payment of that bill appears flawed. If they claim the machine as corporate property, Miehls should be reimbursed for the purchase price which was ultimately charged back against him in the reconstruction of the books and records. The corporation would likewise then be liable for maintenance and operation costs paid by Miehls. The trial court, however, resolved the allocation of costs incurred in favor of Miehls's ownership and the corporation's liability to pay for services rendered to the corporation. That disposition of the questions raised by plaintiffs was permissible under the evidence, viewed most favorably to sustain the trial court's decision. *Lucas v. Lucas,* 95 N.M. 283, 621 P.2d 500 (1980).

2. *Loan for Miehls's Residence.*

Plaintiffs' stated concern in this argument is that the corporation remains liable on a note of $42,520.47 covering cost of construction of the Miehls residence. The assertion is not supported by the record.

Miehls apparently used a part of the interim financing he obtained from the First National Bank of Artesia in May of 1976 for development of the subdivision, to build his home. The loan was collateralized by the subdivision land and was personally guaranteed by Miehls. It was his testimony that financing could not have been obtained at all had he not signed for the loan personally. It is undisputed that none of the other stockholders were willing to negotiate for any loans either as individuals or as consenting shareholders in the corporation.

In June of 1977, Miehls obtained permanent financing for his home by personally borrowing $86,000 from Carlsbad Savings and Loan. He used the proceeds from that loan to pay $82,294.19 of the amount owing to the Artesia bank. That represented the

amount of money used to construct the Miehls residence. The proportional share of interest attributable to the amount used for his residence was then paid to the bank out of Miehls's $40,000 management fee.

A month after reducing the Artesia loan, Miehls obtained $250,000 in permanent financing for the subdivision from Carlsbad Savings and Loan and the Artesia bank was fully paid off. The land was again put up as collateral and again Miehls personally guaranteed the loan.

The $42,000 shown to be still due the Artesia bank was not for construction of the Miehls home, but according to the accountant's compilation report, represented interim financing obtained for constructing the Truitt home.

There is sufficient evidence that Miehls repaid with interest any money borrowed for his residence from the corporation's interim financing fund. We are not directed to any evidence indicating that Miehls obtained a benefit to the detriment of the corporation.

### 3. *The Wildberger Transaction*

■ Plaintiffs' next contention is that $4,800 of a $14,800 price on a lot sold to Mr. and Mrs. Wildberger was converted by Miehls. There was evidence that the corporation owed Wildberger $4,800 for services rendered; that $4,800 was subtracted from the total selling price of the lot to satisfy the debt. Plaintiffs did not call the Wildbergers to testify; they ask us to infer that Miehls pocketed the $4,800, instead. Obviously the trial court accepted the explanation offered. The trier of facts resolves disputed factual issues. *Webb, supra.*

### 4. *Bills Paid*

■ Finally, plaintiffs protest that New Cal paid for items charged to Don Miehls and used by him in his personal capacity. They rely on information contained in Plaintiffs' Exhibit # 23, prepared by plaintiffs' accountant, which lists invoices paid by New Cal during the developmental stage of the subdivision. Over $139,000 worth of materials and services were charged to Miehls directly, and they insist that the court should have directed Miehls to pay for those items himself.

During the corporation accountant's testimony it was elicited that those bills were paid by the corporation because, according to his information, they represented developmental costs of the subdivision and he had no reason to doubt that they were. The plaintiffs' accountant agreed that the corporation was not harmed by Miehls signing his name individually to bills rendered for development costs of the subdivision. He also agreed that Miehls probably could have been held personally responsible for paying those bills if the corporation hadn't.

A review of the items charged to Miehls and paid by New Cal supports the testimony that the charges were related to the subdivision development. They include bills for trenching, fill dirt, piping, installation of manholes, paving, architectural and engineering fees, and similar expenses. No evidence was introduced to show that the services rendered or goods supplied benefited Miehls personally. The list disclosed the names of the vendors, dates and amounts of invoices, and the purpose of the costs billed. There was no evidence from any source that Miehls personally received services or products reflected by the challenged bills that were paid by the corporation, and plaintiffs called no witnesses, other than Miehls, to testify regarding the billings.

We will not substitute our judgment, even if we were inclined to do so, for the judgment of the factfinder on this issue. *See Toltec Int'l, Inc. v. Village of Ruidoso*, 95 N.M. 82, 619 P.2d 186 (1980).

### III.

■ Having disposed of plaintiffs' specific allegations of misconduct, we turn to the crux of the argument on appeal: that New Cal's directors and Miehls breached their fiduciary duty to the corporation; that the "business judgment" rule cannot be used to justify improper transactions. The essence of fiduciary duty is stated in *Pepper v. Litton*, 308 U.S. 295, 306, 60 S.Ct.

238, 245, 84 L.Ed. 281 (1939). Omitting all of the citations, we quote the Supreme Court:

A director is a fiduciary. So is a dominant or controlling stockholder or group of stockholders. Their powers are powers in trust. Their dealings with the corporation are subjected to rigorous scrutiny and where any of their contracts or engagements with the corporation is challenged the burden is on the director or stockholder not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein.

The following application of the "business judgment" rule is from Henn, Law of Corporations, 482–83, § 242 (1979):

If in the course of management, directors arrive at a decision, within the corporation's powers (*intra vires*) and their authority, for which there is a reasonable basis, and they act in good faith, as the result of their independent discretion and judgment, and uninfluenced by any consideration other than what they honestly believe to be the best interests of the corporation, a court will not interfere with internal management and substitute its judgment for that of the directors to enjoin or set aside the transaction or to surcharge the directors for any resulting loss.

\* \* \* \* \* \*

Although the "business judgment" rule is usually stated in terms of director functions, it is no less applicable to officers in the exercise of their authority and may be applicable to controlling shareholders when they exercise their more extraordinary management functions.

Guided by these basic considerations, we are confident that the trial court weighed the evidence and the credibility of the witnesses and decided that Miehls and his fellow directors acted in good faith; that the corporate obligations incurred were reasonable and advantageous to the corporation; and that the corporation had not suffered any losses because of corporate mismanage-

ment or breach of fiduciary duty. Since a reviewing court examines the record and the evidence in a light most favorable to support the trial court's findings, *Fierro v. Murphy*, 85 N.M. 179, 510 P.2d 112 (Ct.App. 1973), we cannot say the Court's analysis of the evidence was erroneous.

We conclude, therefore, that (1) The trial court's dismissal of the stockholder's derivative suit is a decision denying the relief requested by plaintiffs. There is no merit to the argument that the derivative action was left undecided. (2) The business judgment rule was properly applied; it sustains the corporate transactions undertaken by Miehls and immunizes management from liability. *Henn, supra*, at 482. Plaintiffs' argument that the business judgment rule was overextended is really a request that this court reweigh the evidence and substitute its judgment for the trial court's. That is not the proper function of an appellate court. *Wendell v. Foley*, 92 N.M. 702, 594 P.2d 750 (Ct.App.1979). (3) To justify liquidation pursuant to § 53–16–16, N.M.S.A.1978, the trial court would have had to find that the conduct of those in control of the corporation was "illegal, oppressive or fraudulent" or that corporate assets were wasted. The trial court declined to find wrongdoing by the directors or by Miehls and found, instead, that plaintiffs simply disagreed with business decisions made by defendant. Section 53–16–16, *supra*, does not provide that disagreement warrants liquidation. Indeed, Finding 5 seems to recognize that conduct that does not produce an injury, even though objectionable to the protestants, does not call for judicial interference. The trial court's findings are supported by the evidence.

We affirm the judgment. IT IS SO ORDERED.

DONNELLY, J., concurs.

SUTIN, J., dissents.

SUTIN, Judge (dissenting).

I dissent.

The majority opinion states:

The trial court dismissed the plaintiffs-minority shareholders' derivative action and request for liquidation, brought pursuant to § 53–16–16, N.M.S.A.1978. They appeal; we affirm.

The trial court entered a "Decision" in which it made findings of fact and conclusions of law. The conclusions of law read:

1. The restraining order heretofore entered will be dissolved.

2. The complaint of plaintiffs shall be dismissed.

3. Each of the parties should bear his own costs.

Plaintiffs appealed from the Decision, Findings of Fact and Conclusions of Law. No final judgment or decision was entered that the prior restraining order be dissolved nor that plaintiffs' complaint be dismissed with prejudice.

Rule 3(a)(1) of the Rules of Appellate Procedure for civil cases reads:

In civil actions, any party aggrieved may appeal to the appropriate appellate court within thirty days after entry of:

(1) any final judgment or decision;

This language means "any final judgment or final decision."

Rule 52(B)(1) of the Rules of Civil Procedure provides for a decision of the trial court which shall consist of its findings of fact and conclusions of law. Rule (B)(2) provides that:

Upon motion of a party made not later than ten days *after entry of judgment* the court may amend its findings or make additional findings and may *amend the judgment* accordingly. [Emphasis added.]

Subsection (B)(2) declares that "findings of fact and conclusions of law" do not constitute a "final judgment or decision." *McDaniel v. Vaughn,* 42 N.M. 422, 423, 80 P.2d 417 (1938) says:

The * * * [rule] requires the district court to make a decision consisting of findings of such ultimate facts and conclusions of law stated separately as are necessary *to support his judgment,* in a single document * * *. The same result

may be accomplished by incorporating the findings and conclusions *in the judgment.* [Emphasis added.]

"[T]he word 'decision' as used in Rule 52 means 'findings of fact and conclusions of law.'" *United Nuclear Corp. v. General Atomic Co.,* 93 N.M. 105, 122, 597 P.2d 290 (1979). It does not mean "judgment." *Trujillo v. Tanuz,* 85 N.M. 35, 508 P.2d 1332 (Ct.App.1973).

Rules of practice and orderly procedure require that findings of fact and conclusions of law be made before judgment is entered. *Gilmore v. Baldwin,* 59 N.M. 51, 278 P.2d 790 (1955); *Kipp v. McBee,* 78 N.M. 411, 432 P.2d 255 (1967). The decision of the court is the basis upon which the judgment of the court rests. *Mosley v. Magnolia Petroleum Co.,* 45 N.M. 230, 114 P.2d 740 (1941); *Lusk v. First Nat. Bank of Carrizozo,* 46 N.M. 445, 130 P.2d 1032 (1942).

Prior to 1974, an appeal was allowed from entry "of any final judgment." It was then held that where no final judgment was contained in the record, the appeal is dismissed. *Cornett v. Fulfer,* 26 N.M. 175, 189 P. 1108 (1919). The parties filed a stipulation that cured the proposition. But the order of the trial court was not a final judgment and the appeal was again dismissed. *Cornett v. Fulfer,* 26 N.M. 368, 189 P. 1108 (1920).

In 1974, the words "or decision" were added. "The words 'final decision in the district court,' mean the same thing as 'final judgments and decrees' as used in former acts regulating appellate jurisdiction." *In the Matter of the Application of Tiffany,* 252 U.S. 32, 36, 40 S.Ct. 239, 241, 64 L.Ed. 443, 444 (1920); *Karl Kiefer Mach. Co. v. U. S. Bottlers Machinery Co.,* 108 F.2d 469 (7th Cir. 1939). "A 'final decision' generally is one which ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Catlin v. United States,* 324 U.S. 229, 233, 65 S.Ct. 631, 633, 89 L.Ed. 911, 916 (1945).

*Crowe v. De Soto Consolidated School District,* 246 Iowa 38, 66 N.W.2d 859, 860 (1954) says:

As a general rule decisions, opinions, findings or verdicts do not constitute a judgment or decree, but merely form a basis on which the judgment or decree is subsequently to be rendered. [Citations omitted.] A final judgment or decision is one that finally adjudicates the rights of the parties, and it must put it beyond the power of the court which made it to place the parties in their original positions. It is a determination which may be enforced by execution or in some similar manner.

To the same effect is *Chase v. United States Fidelity & Guaranty Co.*, 71 R.I. 81, 42 A.2d 488 (1945).

To deviate from orderly procedure and declare a Rule 52 "decision" to be a "final judgment or decision" will open the door to extraneous transformation. This Court lacks jurisdiction to decide this case on the merits.

I also dissent from the majority opinion. It fails to respond to plaintiffs' position. Plaintiffs claim that the decision of the trial court failed to address the stockholders' derivative action. I agree. The trial court found that:

It is the view of the Court that the problem is inherent in the business relationships of the parties and their respective interests in the corporation, *and is not a problem capable of resolution by the Court.* [Emphasis added.]

The record shows that this case was tried on August 30, 1979 and October 15, 1980. Thirteen and one-half months had passed between both hearings. On November 24, 1980, plaintiffs filed requested findings and conclusions. Defendants requested none. On June 17, 1981, twenty-two months after the first hearing, eight months after the last hearing and seven months after plaintiffs' requests were filed, the court denied plaintiffs' requests and rendered its decision. What circumstances caused this extraordinary delay is unknown.

In *Weiss v. Hanes Mfg. Co.*, 90 N.M. 683, 568 P.2d 209 (Ct.App.1977) we did not rely on the memory of the court. We said:

"Memory" is uncertain 21½ months later when "memory" is restricted to a recollection of the veracity of witnesses who testified and a remembrance of the evidence heard during trial. Many duties, affairs, events, occurrences and interests have intervened during the interim period. The certainty of memory begins to fade with the passage of time. Decisions based on memory are as uncertain as the testimony of witnesses who seek to recollect the facts of an event that occurred two years ago. Refreshment of memory by a court might take on the color of certainty if the testimony were read. If not read, experience teaches that a decision based upon memory alone is poor judgment and should be avoided. [Id. 687, 568 P.2d 209.]

This extraordinary delay was unusual with the district judge. It must have been caused by events beyond his control. The problem involved is capable of resolution by the court. To arrive at a fair result, the record, transcript of proceedings and exhibits should be reviewed and studied, a decision rendered and final judgment entered.

Under Rule 52(B), when requests are made, it is mandatory that the trial court find all of the ultimate facts and determine all of the issues in the case. The failure to do so is reversible error. *Laumbach v. Laumbach*, 58 N.M. 248, 270 P.2d 385 (1954); *Archibeck v. Mongiello*, 58 N.M. 749, 276 P.2d 736 (1954); *Thompson v. H. B. Zachry Co.*, 75 N.M. 715, 410 P.2d 740 (1966). The failure of defendants to submit requested findings and conclusions must not destroy this rule. Coupled with delay in rendering the decision, an exception should be made to the rule that the failure to find an issue in which a party has the burden of proof is a finding to the contrary. *State ex rel. Thornton v. Hesselden Const. Co.*, 80 N.M. 121, 452 P.2d 190 (1969).

Rule 52(B)(1) provides that, in its decision, "the court shall find the facts and give its conclusions of law pertinent to the case * * *." This requirement is mandatory. The court must find the facts on every issue, every controverted issue of fact or every issue of fact raised by the pleadings.

Rule 52(a)(1) of Ch. 1A. Rules of Civil Procedure of North Carolina provides that:

[T]he court shall find the facts specially and state separately its conclusions of law thereon * * *.

*Sprinkle v. Sprinkle*, 17 N.C.App. 175, 193 S.E.2d 468, 472 (1972) states the established rule:

In cases where the trial judge passes on the facts, it is necessary that he (1) find the facts *on all issues joined on the pleadings*, (2) declare the conclusions of law arising on the facts, and (3) enter judgment accordingly. [Emphasis by court.]

*Jones v. Murdock*, 20 N.C.App. 746, 203 S.E.2d 102, 103 (1974) said:

The deficiency * * * is more than a technical one. The necessity for the finding of facts and entry thereof, and for the conclusions of law to be drawn from the facts, is to allow review by the appellate courts. Without such findings and conclusions, we are unable to determine whether or not the judge correctly found the facts or applied the law thereto. [Citations omitted.] Without such findings we may only surmise what the trial court found.

The requirement is not designed to encourage ritualistic recitations by the trial court. The requirement is designed to dispose of the issues raised by the pleadings and to allow the appellate courts to perform their proper function in the judicial system. *Montgomery v. Montgomery*, 32 N.C.App. 154, 231 S.E.2d 26 (1977). When an essential finding is not made, the cause is remanded to the district court for the judge to find the facts from the record evidence as to all the material issues raised by the evidence. *Rosenthal's Bootery, Inc. v. Shavitz*, 48 N.C.App. 170, 268 S.E.2d 250 (1980).

See also, *San Bernardino V. W. Dev. Co. v. San Bernardino V. M. W. Dist.*, 236 Cal. App.2d 238, 45 Cal.Rptr. 793 (1965); *Hagy v. Sharp*, 117 Pa.Super. 187, 177 A. 578 (1935); *Young v. Miner*, 141 Wis. 501, 124 N.W. 660 (1910).

The omission of findings seriously prejudices a party's claim or defense.

The trial court also found that:

The business decisions and the management of the affairs of the corporation by the defendant, by use of his majority stock interest, *are within the bounds of discretion*, and sufficiently in the interests of the corporation that *they should not be disturbed by the Court*. [Emphasis added.]

"Discretion" is not the standard of conduct of a majority stockholder who holds a fiduciary relationship with the corporation and minority stockholders. *H. B. Cartwright v. U. S. B. & T. Co.*, 23 N.M. 82, 167 P. 436 (1917). Section 46–1–1, N.M.S.A. 1978.

The majority opinion transposes the meaning of the findings of the trial court. It holds that the trial court decided that the majority stockholder acted in good faith; that the corporate obligations incurred were reasonable and advantageous to the corporation, and that the corporation suffered no losses because of corporate mismanagement on breach of fiduciary duty. These are issues for the trial court, not this Court, to determine.

The majority stockholder replaced all minority shareholders on the board of directors. It consisted of himself, his wife and son. All actions taken thereafter were by an interested board of directors. Transactions undertaken by this board should be carefully scrutinized when governed by a fiduciary relationship.

This issue should be decided by the trial court based upon the fiduciary relationship that existed between the parties.

This case should be remanded to the district court:

(1) to resolve the issues in this case pursuant to the fiduciary relationship between the parties and render a "Decision" pursuant to Rule 52(B).

(2) to enter "a final judgment or decision," order an appeal therefrom to be filed and have a supplementary record sent to this Court.