**In re Raymond D. CHAVEZ, Debtor.**

**Bankruptcy No. 89–30209.**

United States Bankruptcy Court,
W.D. Texas,
El Paso Division.

March 31, 1992.

Lane C. Reedman, Guevara, Rebe, Baumann, Coldwell & Garay, El Paso, Tex., for Chavez.

Richard M. Leverick, Leverick and Musselman, P.C., Albuquerque, N.M., for FDIC.

DECISION ON COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT AND DENY DISCHARGE OF DEBTOR

LEIF M. CLARK, Bankruptcy Judge.

CAME ON for hearing the Complaint of the Resolution Trust Corporation to Deter-

mine Dischargeability of Debt and Deny Discharge of Debtor. Based on the pleadings, documents, and the transcript of trial, as well as the memoranda of law submitted by the respective parties, the court, having considered same, finds and concludes that the debts at issue are nondischargeable pursuant to 11 U.S.C. section 523(a)(4), but that the debtor's discharge will not be denied.

## FACTUAL BACKGROUND

Sun Country Savings Bank of New Mexico, F.S.B. (SCSB) is a federally insured bank which, like many banks in the Southwest, experienced financial difficulties during the period from 1984 to 1986. As a result of these difficulties, the Federal Home Loan Bank Board (FHLBB) assigned a supervisory agent in order to assist SCSB in remaining a viable institution. Regulations issued by the FHLBB placed limits on the amounts SCSB could lend out. 12 C.F.R. §§ 563.9–1, 563.43. Section 563.9–1 limited the amount for loans to one borrower to an aggregate of $500,000, while section 563.43 limited loans involving affiliated persons to an aggregate of $100,000. 12 C.F.R. §§ 563.9–1, 563.43. The FHLBB specifically spelled out the limitations to SCSB in a supervisory agreement dated May 29, 1985. This supervisory agreement was signed by the debtor, Raymond D. Chavez, as then-president and CEO of SCSB.

In early 1985, a group of potential investors approached the debtor, as an officer and director of SCSB, communicating a possible interest in purchasing the bank through a premium stock offer of $17.50 per share for the directors' shares. The debtor expressed an interest in the offer,

however, the original investment group fell through. Still enticed by the idea of a change in ownership, the debtor contemplated creating a local group to purchase the bank on similar terms.

In board meetings, the debtor and the other directors decided that they needed to secure greater control of the bank through a smaller group of shareholders. In order to facilitate the smaller shareholder group, the board elected to increase their share of ownership by purchasing authorized unissued stock from SCSB's reserves and outstanding stock from current shareholders.[1]

Pursuant to this plan, the debtor sold over 10,000 of his personal shares to the other members of the board for the premium price of $17.50 per share. After this sale, in order to regain his percentage of control, the debtor purchased 12,258 of the authorized unissued shares for the par value of $8.00 per share and 5000 additional unissued shares at $11.00 per share. The debtor also orchestrated transactions with the other directors for their purchases of SCSB stock. The debtor and the other directors substantially increased their holdings in SCSB through purchases of authorized unissued shares at $8.00 per share and of certain outstanding shares at the premium $17.50 per share.

In order to assist in the purchase of these large numbers of shares, the debtor arranged for loans to the directors from SCSB and from El Paso Federal Savings and Loan Association (El Paso). A loan of $99,998.25 was made to each of the directors from SCSB for the initial purchase of the new shares.[2] Additionally, the debtor coordinated a series of loans from El Paso to facilitate the purchase of the remaining shares.[3]

1) Raymond Chavez:    $312,500;
2) Mary Jane Garcia:    $100,000;
3) Vivian Dominguez:    $312,500;
4) James Fergason:    $312,500;
5) Larry Fields:    $312,500;
6) Clarence Fielder:    $100,000;
7) Estella Evans:    $100,000.

a portion of these loans were used to retire the SCSB loans made for the purchase of the initial new shares.

1. Prior to 1985, SCSB had increased the number of shares authorized for sale. This newly authorized stock would retain the same par value as the existing stock, which was $8.00 per share.

2. At all times during the debtor's transactions, regulations limited the total aggregate amount of loans to directors at $100,000. 12 C.F.R. § 563.43.

3. The seven directors borrowed from El Paso the following sums:

The debtor also organized the purchase of SCSB stock by a group of eight people [4] operating under a then-undocumented limited partnership. There is some evidence to suggest that the debtor knew that the individuals were acting as a group (the "McDowell Group"), involved in a common construction project. The evidence also indicates the debtor represented to the McDowell group that if they would each purchase $150,000 worth of SCSB stock, SCSB would assuredly loan them the money for the condominium project. The debtor arranged loans from SCSB to the McDowell group for the stock purchases, classifying them as personal rather than stock loans. Further, the debtor assured the McDowell group that SCSB would repurchase the stock from them if they wished to get out of the transaction.[5]

At the end of all stock transactions, the debtor, the other directors, and the McDowell group had purchased a total of 66,000 shares of the outstanding stock at the premium $17.50 per share. Included among the 66,000 shares sold at the premium were approximately 14,000 owned either by the debtor or his family members. Another 62,000 of the authorized but unissued shares were purchased at the par value of $8.00 per share.

The loans that the debtor secured from El Paso eventually matured; however, the directors did not immediately repay the obligations. El Paso indicated to the debtor that the SCSB stock, which had been pledged for the loans, would be foreclosed upon if the directors did not repay the obligation. Fearing that El Paso would gain control over SCSB with the acquisition of the pledged securities, the debtor organized a second series of loans from SCSB to each of the directors for the purpose of

retiring the El Paso loans. The loans to the directors totaled over $220,000 each.[6] To acquire these loans, the debtor had the directors sign blank notes which represented their liability to SCSB. The primary loan terms were then filled in after the monies were advanced.

The total amount of the SCSB loans to the directors was insufficient to completely satisfy the liability to El Paso, so the debtor appropriated $342,406.80 of SCSB funds in order to completely satisfy the debt. The debtor neither filled out any loan applications, nor sought board approval. The El Paso loans were retired, releasing the pledged securities back to the control of the directors.

In July of 1985, pursuant to the representations made by the debtor to the McDowell group, the debtor orchestrated five loans to the group totalling over $500,000. In May of 1985, the FHLBB had issued a supervisory agreement to SCSB which further limited the amount of loans to one borrower, other than directors, to $250,000.

From the period beginning around 1984 to the present, SCSB experienced financial difficulty much like many of the savings institutions in the Southwest. Because of the initial financial distress, the FDIC placed the bank under conservatorship during the time that the debtor was president and CEO. On March 17, 1989, the debtor filed a voluntary petition for protection under Chapter 7 of the Bankruptcy Code. The FDIC consequently filed an adversary proceeding challenging the dischargeability of the debtor's debts to SCSB on September 26, 1989. In May of 1990, the Office of Thrift Supervision appointed the RTC as receiver for SCSB due to the bank's increasing problems. The RTC is continuing

---

4. The eight people consisted of: E.T. and Claudia LaFore, Mannie Ortiz, Paul Noland, Ralph and Sally Neel, and Jack and Elisa McDowell.

5. In fact, one of the eight, Paul Noland, left the deal and surrendered his stock. The debtor cancelled Mr. Noland's obligation on the stock loan which totaled $165,534.25. Therefore, the

stock which Mr. Noland purchased through the loan for an average price of $12.75, half at $17.50 and half at $8.00, was bought back by SCSB for approximately $14.00 per share.

6. A series of three individual loans were made to each director. The individual loans did not exceed $100,000, but the aggregate did.

the prosecution of nondischargeability as successor to the FDIC and as receiver for SCSB.

## ISSUES PRESENTED

The issues presently before this court are whether the claims alleged by the RTC for the debts which arose due to the actions of the debtor are nondischargeable under 11 U.S.C. section 523(a)(2), (a)(4), or (a)(6), and whether the debtor should be denied a discharge pursuant to 11 U.S.C. section 727.

### I. Dischargeability under § 523

■ In determining dischargeability questions under Section 523 of the Bankruptcy Code, the court must consider the primary purpose of bankruptcy, which is to relieve the honest debtor from the weight of his or her debts and permit a "fresh start." *See Local Loan Co. v. Hunt*, 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934). In order to prevent abuse of the fresh start policy, however, the Code provides several exceptions from discharge in circumstances where the debtor in question is less than honest. *See* 11 U.S.C. § 523(a)(2) (excepting debts from obtaining property through fraud or false statements or representations); *id.* at § 523(a)(4) (excepting debts from fraud or defalcation while a fiduciary or embezzlement or larceny); *id.* at § 523(a)(6) (excepting debts for willful or malicious injury to property of another); *id.* at § 523(a)(12) (excepting debts incurred for malicious or reckless failure to fulfill any obligation to a federal depository institution). Additionally, the code provides for some circumstances where the debtor will totally be denied a discharge on all debts. *See* 11 U.S.C. § 727(a)(2) (denying discharge for intending to hinder, delay, or defraud a creditor by concealing or destroying property); *id.* at § 727(a)(3) (denying discharge for concealing or destroying property, falsifying or failing to keep records from which to ascertain debtor's financial condition); *id.* at § 727(a)(4) (denying discharge for knowingly or fraudulently making a false oath or claim); *id.* at § 727(a)(6) (denying discharge for debtor's failure to obey any lawful order of court). All of these exceptions act to temper the fresh start policy by denying the discharge of debts resulting from certain false, fraudulent or willful conduct. *See In re Grier*, 124 B.R. 229, 231 (Bankr.W.D.Tex.1991). Due to the severity of a "nondischargeable" determination, courts have strictly construed these exceptions in favor of the debtor. *See, e.g., Gleason v. Thaw*, 236 U.S. 558, 562, 35 S.Ct. 287, 289, 59 L.Ed. 717 (1915); *In re Rahm*, 641 F.2d 755, 756–77 (9th Cir.1981); *In re Ellis*, 103 B.R. 977, 980 (Bankr. N.D.Ill.1989); *In re Stillwell*, 96 B.R. 102, 105 (Bankr.W.D.Ky.1988). However, the creditor's burden of proof to show nondischargeability is only preponderance of the evidence. *See Grogan v. Garner*, — U.S. —, —, 111 S.Ct. 654, 661, 112 L.Ed.2d 755, 767 (1991).

#### a. Section 523(a)(2)

■ Section 523(a)(2) provides, in relevant part, that an individual shall not be able to discharge a debt resulting from "money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—(A) false pretenses, a false representation, or actual fraud...." 11 U.S.C. § 523(a)(2). In order to effectuate a false pretense, representation or actual fraud, a debtor must knowingly make a falsehood that involves moral turpitude or an intentional wrong upon which another party relies in surrendering property or money to the debtor. The debtor must actively operate to deceive and cheat another; fraud which is implied in law that may exist in the absence of bad faith will not be sufficient. *See, e.g., In re Ophaug*, 827 F.2d 340 (8th Cir.1987); *In re Hunter*, 780 F.2d 1577 (11th Cir.1986); *In re Howarter*, 114 B.R. 682 (9th Cir.B.A.P. 1990); *In re Hinman*, 120 B.R. 1018 (Bankr.D.N.D.1990).

■ To establish a cause of action under section 523(a)(2), the party objecting to the dischargeability must prove: (1) that the debtor made active false representations or fraud; (2) that the debtor received money, property, services, or an extension, renewal, or refinancing of credit because of the

false representations; and (3) that the representations made were reasonably relied upon and were a substantial factor in the creditor's decision to give the money or services. 11 U.S.C. § 523(a)(2)(A).

■ The debtor made representations to numerous parties which were indeed false. However, to determine liability at this adversarial proceeding, we must ascertain whether or not the debtor actively made false representations to the RTC or FDIC with the specific intent to deceive. In responding to the Cease and Desist Order issued by the FHLBB, the debtor assured them that SCSB would agree not to violate the lending restrictions placed upon them.[7] The evidence offered by the RTC, although compelling, is not sufficient to prove that the debtor made such a representation with the intent to deceive. In fact, the dealings with the McDowell group occurred almost a year prior to the Cease and Desist Order. Therefore, the RTC cannot prove that the debtor made fraudulent statements to the FHLBB concerning the McDowell loans.

The Cease and Desist Order and other supervisory letters from the FHLBB were concerned mostly with loans to Oscar Garcia and his associated businesses. The RTC offered no evidence that the McDowell group was in any way connected with Oscar Garcia. Furthermore, neither the order nor any of the supervisory letters mentioned the McDowell group specifically. Consequently, the intentional element of deception was not shown. In order to prove that the debtor had the intent to deceive, the evidence would have had to have shown that while agreeing not to violate the Cease and Desist Order, the debtor was, at that moment, contemplating or working on a transaction which he knew was a violation of the Cease and Desist prohibitions. The evidence at hand does not establish such intent.

■ The evidence also does not show that the debtor personally received money because of the representations. The mere fact that a liability arises as a consequence of the false representation is not sufficient on its own. *Rudstrom v. Sheridan*, 122 Minn. 262, 142 N.W. 313, 314 (1913). The debtor here did not receive money on account of his representations to the FDIC. In order to show a violation of section 523(a)(2), the money must actually come to the debtor because of the representation. *In re Rippey*, 21 B.R. 954, 958 (Bankr. N.D.Tex.1982). Therefore, because the debtor received no money directly from the representations made, the debt cannot be declared nondischargeable under section 523(a)(2).

■ The third element of section 523(a)(2)(A) requires that the representation made is reasonably relied upon and is a substantial factor in the creditor's decision to release the money. 11 U.S.C. § 523(a)(2)(A). The representations made to the FDIC were reasonably relied upon. The FDIC must be able to rely on statements given to it from member savings institutions. Compelling the FDIC to investigate every statement made to it would be too onerous a task. The action taken in reliance upon the representations, however, was not lending money to the debtor but was refraining from taking further action in examining SCSB's transactions. The debtor received no money or property from the FDIC on account of the representations made. The RTC, therefore, also did not show the third element of nondischargeability under section 523(a)(2)(A).

### b. Section 523(a)(6)

■ Section 523(a)(6) excepts from discharge any debt arising on account of "willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). The phrase "willful and malicious," is a

---

7. The FHLBB issued a Cease and Desist Order in which SCSB was instructed not to make any more loans to an Oscar Garcia or any relation to him. In the response letter, Raymond Chavez represented to the FHLBB that SCSB would no longer loan to Mr. Garcia and that they would conform to all of the mandates issued by the FHLBB. These representations do not constitute the false representations or pretenses as described *supra,* therefore do not constitute violations of § 523(a)(2).

term of art which manifests a special definition in the bankruptcy sense. An act is "willful" where it is done deliberately or intentionally. *See In re Adams*, 21 B.R. 301 (Bankr.N.D.Ohio 1982). Therefore, a "willful and malicious" act includes a wrongful act intentionally done which necessarily causes harm and is without just cause or excuse. *See In re Cecchini*, 780 F.2d 1440 (9th Cir.1986).

A "willful and malicious" act, however, does not include acts resulting in a reckless disregard or even gross negligence. *See, e.g., In re Compos*, 768 F.2d 1155, 1158 (10th Cir.1985); *In re Scarlata*, 127 B.R. 1004, 1013 (N.D.Ill.1991); *In re Guy*, 101 B.R. 961, 981 (Bankr.N.D.Ind. 1988). Courts have held as reckless disregard an action which involves a high degree of awareness of the probability for injury but which does not necessarily cause such injury. *Cf. Seidenstein v. National Medical Enterprises*, 769 F.2d 1100, 1104 (5th Cir.1985) (defining "reckless disregard" in defamation cases).

In *Tinker v. Colwell*, the United States Supreme Court defined the standard for "willful and malicious" in bankruptcy cases as including a "wilful [sic] disregard of what one knows to be his duty." *Tinker v. Colwell*, 193 U.S. 473, 487, 24 S.Ct. 505, 509, 48 L.Ed. 754 (1903). Subsequent cases interpreting *Tinker* equated this "willful disregard" with reckless disregard and loosened the "willful and malicious" standard for several years. In 1985, the Tenth Circuit effectively overruled this lightened standard, holding that recent Congressional amendments clearly indicated that "willful" meant deliberate or intentional. *See In re Compos*, 768 F.2d 1155, 1157–58 (10th Cir.1985); *see also* H.R.Rep. No. 595, 95th Cong., 1st Sess. 365 (1977), *reprinted in*, 1978 U.S.C.C.A.N. 5787, 5963, 6320–21 (indicating that reckless disregard is insufficient for "willful" injury under section 523(a)(6)).

The Fifth Circuit breaks down the cause of action for section 523(a)(6) into two elements: (1) a wrongful act intentionally done (i.e., willful); and (2) which necessarily causes harm and is without just cause or excuse (i.e., malicious). *See Chrysler Credit Corporation v. Perry Chrysler Plymouth*, 783 F.2d 480, 486 (5th Cir.1986); *see also Seven Elves, Inc. v. Eskenazi*, 704 F.2d 241 (5th Cir.1983); *In re Dardar*, 620 F.2d 39 (5th Cir.1980). The actions of the debtor in the case at hand involved a disregard of his fiduciary duties. The debtor violated the lending restrictions placed on SCSB and other safe lending practices in securing the different loans for himself and the other directors. He sold a large portion of his personal stock at the premium price while purchasing more stock from the bank at the lower par value, essentially usurping the bank's opportunity to raise a higher amount of capital. If all of the transactions involved had succeeded, there would have been no real loss to SCSB. In fact, SCSB's economic outlook could very well have improved. However, as it turned out, the actions undertaken by the debtor caused injury to SCSB and, although suspect in their own rights, amounted to mere reckless disregard. Conduct which reaches the standard of reckless disregard, although not in and of itself sufficient to determine nondischargeability under section 523(a)(6), can be used as evidence in favor of the second element of maliciousness. Therefore, because the evidence presented is insufficient to prove both elements of nondischargeability, the debts do not fall under section 523(a)(6).

### c. Section 523(a)(4)

Section 523(a)(4) allows for an exemption from discharge where the individual debt arises from "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." This exception constituted the combination of the proposed House Bill which would have excepted a debt for embezzlement and larceny, and the Senate version, which excepted a debt for "fraud while acting in a fiduciary capacity, defalcation, embezzlement or misappropriation." House Bill H.R. 8200; Senate Bill S. 2266. The corresponding compromise created an exception from discharge for debts arising from fraud or defalcation while acting as a

fiduciary, and for embezzlement or larceny at any time.

■ The test to determine whether the debt created by a fiduciary falls within the exception to discharge of Section 523(a)(4) has two steps. *In re Wright,* 87 B.R. 1011, 1017 (Bankr.D.S.D.1988). First, a fiduciary relationship must exist prior to the particular transaction from which the debt arose. *See, e.g., In re Cross,* 666 F.2d 873, 879 (5th Cir. Unit B 1982); *In re Menendez,* 107 B.R. 789, 793 (Bankr.S.D.Fla.1989); *In re Valdes,* 98 B.R. 78, 80 (Bankr.M.D.Fla. 1989). Second, some type of fraud or defalcation must occur during the fiduciary relationship.

### i. Existence of a Fiduciary Duty

The savings and loan crisis is well known throughout the country at this point in time. The state and federal governments will bear the costs of the losses, as well as the American people in general. An exhorbitant amount of money will be needed in order to restore the stability in the banking and saving and loan industry. The mismanagement and self-dealing engaged in by many of the officers and directors of these failed institutions directly contributed to their failure.

■ In 1990, Congress passed the Crime Control Act. Contained within the act, Congress provided for an amendment to the Bankruptcy Code which would affect treatment of the debts incurred by these institution directors. Section 523 was amended through the addition of subsection (e), which provides that "any institution-affiliated party of a depository institution or insured credit union *shall be considered to be acting in a fiduciary capacity* with respect to the purposes of subsection (a)(4) or (11)." (emphasis added) 11 U.S.C. § 523(e).

Section 101(33)(A) defines the term "institution-affiliated party" as that given in section 3(u) of the Federal Deposit Insurance Act. 12 U.S.C. § 1813(u). Section 3(u) provides that the term means "... *any director, officer, employee, or controlling stockholder* (other than a bank holding company) of, or agent for, an insured depository institution." (emphasis added) 12 U.S.C. § 1813(u). Section 101(35)(A) defines "insured depository institution" as that given under section (c)(2) of the Federal Deposit Insurance Act. 12 U.S.C. § 1813(c)(2). That section provides that an insured depository institution means "... *any bank or savings association* the deposits of which are insured by the Corporation pursuant to this Act." (emphasis added) 12 U.S.C. § 1813(c)(2).

Combining the two definitions for purposes of section 523(e) yields the result that any director, or even majority shareholder, of a lending or banking institution which is insured under the FDIC shall be automatically considered to be acting in a fiduciary capacity for purposes of (a)(4). At all times relevant hereto, SCSB was a federally insured institution. The debtor also was a member of the board of directors and one of the majority shareholders. The newly amended Section 523(e) mandates that the debtor automatically be treated as a fiduciary to SCSB. The fact that the Crime Control Act of 1990 became effective after the transactions of the debtor is irrelevant. The Congressional intent is clear that the officers and directors who were most responsible for the collapse of the savings and loan industry would not be allowed to discharge the debts which accrued due to their improprieties. H.R.Rep. No. 101–681(I), 101st Cong., 2d Sess. 180–81 (1990), *reprinted in,* 1990 U.S.C.C.A.N. 6472, 6586–87. ("an institution-affiliated party ... will be deemed *to have been* acting in a fiduciary capacity for purposes of section 523(a)(4) ...") (emphasis added). Had Congress merely intended to give the amendment postscriptive effect, the bulwark of the debt of the present crisis would have been left unaffected.

■ Alternatively, even if section 523(e) did not automatically create the fiduciary duty, the debtor here would still have been found to owe a fiduciary duty to SCSB. The issue of the existence of a fiduciary relationship is one of federal law, for Section 523(a)(4) purposes. *See In re Black,* 787 F.2d 503, 506 (10th Cir.1986). State

law, however, plays an important role in determining the existence of a trust relationship. *See In re Johnson*, 691 F.2d 249, 251 (6th Cir.1982).

The fiduciary duty under section 523(a)(4) requires that an express trust exist between the debtor and the creditor, a relationship which may be evident from state law. This includes the explicit proclamation of a trust relationship, a clearly defined trust *res*, and the intent to create such a relationship. *In re Sax*, 106 B.R. 534, 539 (Bankr.N.D.Ill.1989). The *Sax* court held that a bank explicity entrusts to its directors, control over the bank's funds. Further, by accepting the position, the director agrees to use the *res*, the bank's assets, solely for the benefit of the bank. Undoubtedly, then, the nature of the director's trust relationship is express and clear with regard to federal bankruptcy caselaw.

Prior to the addition of subsection (e) to section 523, a long line of federal cases held that bank directors owed a fiduciary duty to their banks, and that breaches of those duties constituted an exception to discharge under section 523(a)(4). *See, e.g., Harper v. Rankin*, 141 F. 626 (4th Cir.1907), *cert. denied*, 200 U.S. 621, 26 S.Ct. 758, 50 L.Ed. 624; *Hartford Accident & Indemnity Co. v. Flanagan*, 28 F.Supp. 415 (S.D.Ohio 1939); *In re Sax*, 106 B.R. 534, 539 (Bankr.N.D.Ill.1989); *In re Wright*, 87 B.R. 1011, 1017–18 (Bankr. D.S.D.1988). The more recent cases have held that the statutes covering federally insured banks "impliedly recognize the fiduciary duty of bank directors and officers...." *Wright*, 87 B.R. at 1018. 12 U.S.C. section 1818(e)(1) authorizes the FDIC to remove bank directors or officers who engage or participate in practices which constitute a breach of their fiduciary duties. 12 U.S.C. § 1818(e)(1). This federal law impliedly recognizes the explicit state created trust relationship and therefore constitutes a federal determination of the fiduciary issue as mandated under *Johnson, Sax,* and *Black*.

New Mexico law considers any corporate director or officer a fiduciary of that corporation. N.M.Stat.Ann. § 46–1–1 (1978); *see also* N.M.Stat.Ann. § 53–7–28 (1978) (relieving, under state law, directors or officers from personal liability on debts accrued on account of a breach of their fiduciary duties); *DiIaconi v. New Cal Corp.*, 97 N.M. 782, 643 P.2d 1234, 1240 (Ct.App.1982) ("A director is a fiduciary. So is a dominant or controlling stockholder or group of stock holders. Their powers are in trust."). The debtor, as a director of the savings and loan corporation SCSB, held an express trust relationship under New Mexico law. Although state law does not control the fiduciary question for bankruptcy purposes, it helps to ascertain whether or not a trust relationship existed between the two parties. Subsequently applying the federal law recognizing the trust relationship established through state law, the debtor clearly owed a fiduciary duty to SCSB.

### ii. Definition of "Fraud or Defalcation"

The definition of "fraud" for purposes of 523(a)(4) is the same as fraud with respect to 523(a)(2). *See In re Tsamasfyros*, 940 F.2d 605, 607 (10th Cir.1991); *Black*, 787 F.2d at 505. An active misrepresentation must be made to a party which, in turn, relies on that misrepresentation in giving the debtor property or money. In the case at hand, because the debtor did not meet the specific intent requirements for fraud under 523(a)(2), he also does not meet the fraud requirements for 523(a)(4).

While "fraud" is a relatively common legal term having a more steadfast definition, "defalcation" is not. The modern definition of "defalcation," for bankruptcy purposes, emanates from the case of *Central Hanover Bank & Trust v. Herbst*, 93 F.2d 510 (2d Cir.1937). In delivering the opinion for the Second Circuit Court of Appeals, Judge Learned Hand defined "defalcation" as a much broader term than "embezzlement" or "misappropriation." He premised this statement on the fact that the original section where "defalcation" first appeared, appeared with "embezzlement" and "fraud." He reasoned that "it

must here have covered other defaults than deliberate malversations, else it added nothing to the words, 'fraud or embezzlement.' " *Central Hanover*, 93 F.2d at 511. Prior to the *Central Hanover* decision, "defalcation" had a colloquial definition which implied some "moral dereliction." *Central Hanover* injected the interpretation that, in the bankruptcy sense, "defalcation" could even include innocent defaults by fiduciaries, but because the law was unclear, the court would assume that it required some minimal form of impropriety, although much less than that commanded for fraud, embezzlement, or misappropriation.

Modern cases interpret *Central Hanover*'s definition of "defalcation" closely to Judge Hand's idea. They have upheld the proposition that "defalcation" is a much broader term than misappropriation or fraud. *See, e.g., In re Johnson*, 691 F.2d 249, 254–55 (6th Cir.1982); *In re Reeves*, 124 B.R. 5, 8 (Bankr.D.N.H.1990); *In re Hirsch*, 101 B.R. 364, 366 (Bankr.S.D.Fla. 1989); *In re Guy*, 101 B.R. 961, 984–85 (Bankr.N.D.Ind.1988). The broadening definition lengthens the list of actions constituting a "defalcation" to now include negligent, innocent, ignorant, or simple defaults or actions which breach fiduciary duties. *See In re Twitchell*, 72 B.R. 431, 434–35 (Bankr.D.Utah 1987), *rev'd*, 91 B.R. 961 (D.Utah 1988), *rev'd*, 892 F.2d 86 (10th Cir. 1989).

### iii. Fiduciary Duties

■ Generally, two duties exist under a fiduciary relationship: the duty of care, and the duty of loyalty. *See, e.g., Gearhart Industries, Inc. v. Smith Internat'l, Inc.*, 741 F.2d 707, 719 (5th Cir.1984) (dividing the duty of care into duty of care and duty of obedience); *Imperial Group (Texas), Inc. v. Scholnick*, 709 S.W.2d 358, 363 (Tex.App.—Tyler 1986, writ ref'd n.r.e.). The duty of care involves the director's diligence and competence in running the corporation. *See Gearhart*, 741 F.2d at 720–21; *McCollum v. Dollar*, 213 S.W. 259, 261 (Tex.Comm'n App.1919, holding approved) (establishing reasonable prudent person standard). The duty of loyalty

addresses conflicts of interest and prohibits any self-dealing at the expense of the corporation. *See Gearhart*, 741 F.2d at 719. Combined, they yield the general premise that the director must act solely for the benefit of the corporation, a statement common to trust relationships. *See, e.g., Gearhart*, 741 F.2d at 719–21; *Scholnick*, 709 S.W.2d at 362–63; *Hughes v. Houston Northwest Medical Center*, 680 S.W.2d 838, 843 (Tex.App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.), *cert. denied*, 474 U.S. 1020, 106 S.Ct. 571, 88 L.Ed.2d 555. Breaches of these duties may arise where the director engages or promotes activities which are detrimental to the corporation. *See McCollum*, 213 S.W. at 261. Further, a breach may occur where the director seizes an opportunity which the corporation could have profited from. *See, e.g., Gearhart*, 741 F.2d at 719–20; *Scholnick*, 709 S.W.2d at 363.

■ In the present case, the debtor breached both the duty of care and the duty of loyalty. The debtor arranged loans to the other directors and the McDowell group in violation of the federal limitations established by the FHLBB. He approved loans from SCSB knowing that they were to be used to purchase SCSB stock, also in violation of federal regulations. He also extended loans to the McDowell group that he promised to rescind if they decided to get out of certain transactions. Additionally, he appropriated over $300,000 from SCSB's reserves without authorization. Clearly, the actions of the debtor here do not constitute those of a prudent person acting within a duty of care to a lending institution.

The debtor's stock transactions also violated his fiduciary duties by seizing the opportunity of SCSB to raise more capital through sales of the unissued stocks at the premium price. Instead, the debtor took the opportunity to sell his own stock at the premium price while replenishing his holdings through purchases of the unissued stock at less than half of his selling price. Such actions clearly constitute self-dealing on the debtor's part and therefore a breach of his duty of loyalty.

The knowing violation of federal regulations, the unauthorized appropriation of funds, and the seizure of SCSB's opportunity to increase capital through premium stock sales plainly fall within the definition of "defalcation," for 523(a)(4) purposes. In fact, if innocent or ignorant defaults may lead to "defalcation," the debtor's knowing improprieties fall into the definition without question.

*II. Denial of Discharge under § 727*

As noted previously, the requirements for discharge are construed generously in favor of the debtor. Any claim for denying discharge therefore, must be "real and substantial." *In re Burgess,* 955 F.2d 134, 137 (1st Cir. Jan. 31, 1992). Section 727 defines several activities which may cost the debtor his or her discharge. 11 U.S.C. § 727. These acts include: acts against property intending to hinder, delay, or defraud creditors; acts against any recorded information concerning the debtor's financial condition; knowingly or fraudulently making false or fraudulent claims; and failing to obey certain orders of a court of law. 11 U.S.C. § 727(a)(2), (3), (4), (6). Because a denial of discharge carries such serious consequences, it should not be granted without evidence of specific intent. *See Burgess,* at 137.

In the case at hand, the debtor did not transfer, remove, or destroy any property with the intent to hinder, delay, or defraud SCSB. Further, the RTC offered no evidence that the debtor made any false oaths with the specific intent to defraud SCSB. The debtor did fail to keep a record of the appropriated money at SCSB; however, § 727(a)(3) applies to the financial records of the debtor and not to the debtor's employer, unless the debtor and the employer are indistinguishable. *See Burgess,* at 137–38.

A debtor should be granted a discharge unless to do so would be an injustice; it is for this reason that § 727 is construed in favor of debtors. The RTC offered no convincing evidence that the debtor engaged in any of the activities prohibiting discharge under § 727. Accordingly, the debtor's discharge will not be denied.

### CONCLUSION

"Bankruptcy courts are inherently courts of equity. It is a well known legal maxim that '[h]e who comes into equity must come with clean hands.'" *In re Grier,* 124 B.R. 229, 234 (Bankr.W.D.Tex.1991) (quoting D. Dobbs, Handbook on the Law of Remedies 45–46 (1973)). The debtor, Raymond D. Chavez, comes to this court seeking to discharge a debt arising from transactions which occurred while acting as a fiduciary at SCSB. In light of the foregoing, the court finds that Raymond Chavez's conduct amounted to a breach of his fiduciary duties to SCSB and accordingly constituted defalcation while acting as a fiduciary. The court, therefore, orders that pursuant to 11 U.S.C. section 523(a)(4), the obligations owed to SCSB by the debtor Raymond D. Chavez shall not be discharged. Additionally, the evidence does not show that the debtor's acts met the prohibitions of section 727. The court, therefore, will not deny his discharge.

All findings may be construed as conclusions and vice versa. All issues shall be deemed disposed. Judgment will be entered consistent with this decision.